**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| APTARGROUP, INC. and APTAR FRANCE SAS,<br><br>       Plaintiffs,<br><br>       v.<br><br>ARS PHARMACEUTICALS, INC. and ARS<br>PHARMACEUTICALS OPERATIONS, INC.,<br><br>       Defendants. | Case No.: 1:25-CV-02545-DEH-SLC<br><br>ORAL ARGUMENT REQUESTED |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS PLAINTIFFS' COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND................................................................................... 2

LEGAL STANDARD............................................................................................. 5

ARGUMENT ......................................................................................................... 6

I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE DEFEND
      TRADE SECRETS ACT ............................................................................ 7

      A.    The Complaint fails to allege the existence of a trade secret.................. 7

      B.    The Complaint fails to allege misappropriation.................................. 11

            1.    An FDA determination of "interchangeability" is irrelevant.................. 14

            2.    The Complaint's other circumstantial allegations are insufficient. ......... 15

            3.    The Complaint does not plausibly allege that ARS, rather than
                  another source, disclosed Aptar's trade secrets to Silgan. ...................... 21

II.   THE COMPLAINT FAILS TO STATE A CLAIM FOR MISAPPROPRIATION
      UNDER NEW YORK LAW ...................................................................... 22

III.  THE COMPLAINT FAILS TO STATE CLAIMS FOR BREACH OF
      CONTRACT ............................................................................................ 23

CONCLUSION.................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys. v. Sandoz, Inc.*,
  486 F. Supp. 2d 767 (N.D. Ill. 2007) ....................................................................14

*Abbott Labs. v. Sandoz, Inc.*,
  566 F.3d 1282 (Fed. Cir. 2009)............................................................................14

*Ad Lightning Inc. v. Clean.io, Inc.*,
  2020 WL 4570047 (S.D.N.Y. Aug. 7, 2020)..........................................................13

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000)........................................................................8, 12

*Amgen Inc. v. Sanofi*,
  598 U.S. 594 (2023).............................................................................................8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................5, 11, 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................5, 13

*Benitez v. Valentino U.S.A., Inc.*,
  2024 WL 1347725 (S.D.N.Y. Mar. 29, 2024) ............................................................9

*Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*,
  1 F.Supp.3d 224 (S.D.N.Y. 2014) .........................................................................8

*BondPro Corp. v. Siemens Power Gen., Inc.*,
  463 F.3d 702 (7th Cir. 2006) ...............................................................................8

*Brodie v. Green Spot Foods, LLC*,
  503 F. Supp. 3d 1 (S.D.N.Y. 2020) ......................................................................5

*Broker Genius, Inc. v. Zalta*,
  280 F. Supp. 3d 495 (S.D.N.Y. 2017).....................................................................7

*Cerner Corp. v. Visicu, Inc.*,
  2011 WL 27577 (W.D. Mo. Jan. 4, 2011) ..............................................................14

*Citizens United v. Schneiderman*,
  882 F.3d 374 (2d Cir. 2018)................................................................................6

# TABLE OF AUTHORITIES
(continued)

Page(s)

*CleanFish, LLC v. Sims,*
   2020 WL 1274991 (N.D. Cal. Mar. 17, 2020)....................................................17, 18

*Converged Compliance Sols., Inc. v. XOP Networks, Inc.,*
   2024 WL 4665114 (S.D.N.Y. Sept. 25, 2024)...................................................22, 23

*Core SWX, LLC v. Vitec Grp. US Holdings, Inc.,*
   2022 WL 3588081 (E.D.N.Y. July 14, 2022)............................................11, 15, 20

*Elsevier Inc. v. Doctor Evidence, LLC,*
   2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ............................................5, 7, 9, 10

*EVRYTHNG Ltd. v. Avery Dennison Retail Info. Servs., LLC,*
   2021 WL 11592336 (S.D.N.Y. Aug. 2, 2021)...............................................10

*Ferring Pharms. Inc. v. Serenity Pharms., LLC,*
   2020 WL 4926458 (S.D.N.Y. Aug. 21, 2020)................................................12

*Fortune Mfg. Co., Ltd. v. Zurn Indus., LLC,*
   2011 WL 13220133 (C.D. Cal. Nov. 14, 2011)..............................................21

*Free Country Ltd. v. Drennen,*
   235 F. Supp. 3d 559 (S.D.N.Y. 2016)..............................................11

*Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.,*
   174 F. Supp. 3d 378 (D.D.C. 2016) ..............................................20

*GMH Cap. Partners v. Fitts,*
   2025 WL 950674 (S.D.N.Y. Mar. 28, 2025) ................................................ *passim*

*Joester Loria Grp. v. Licensing Co.,*
   2011 WL 1642736 (S.D.N.Y. Apr. 29, 2011).............................................21

*Johns Hopkins Univ. v. Datascope Corp.,*
   543 F.3d 1342 (Fed Cir. 2008)..........................................14, 15

*Lehman v. Dow Jones & Co., Inc.,*
   783 F.2d 285 (2d Cir. 1986)..............................................7

*M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.,*
   2019 WL 6655274 (C.D. Cal. Sept. 23, 2019) ..............................................20

*MBC Fin. Servs. Ltd. v. Bos. Merchant Fin., Ltd.,*
   2016 WL 5946709 (S.D.N.Y. Oct. 4, 2016) ..............................................4

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*MedQuest Ltd. v. Rosa*,
  2023 WL 2575051 (S.D.N.Y. Mar. 20, 2023) .........................................................23

*In re Merrill Lynch Ltd. P'ships Litig.*,
  154 F.3d 56 (2d Cir. 1998)......................................................................................23

*My Mavens, LLC v. Grubhub, Inc.*,
  2023 WL 5237519 (S.D.N.Y. Aug. 14, 2023) ............................................6, 11, 13

*Perimeter Solutions LP v. Fortress North America, LLC*,
  2025 WL 553288 (E.D. Cal. Feb. 19, 2025).....................................16, 17, 18, 19

*Phazr, Inc. v. Ramakrishna*,
  2019 WL 5578578 (N.D. Tex. Oct. 28, 2019).......................................................20

*PowX Inc. v. Performance Sols., LLC*,
  2024 WL 3010040 (S.D.N.Y. June 14, 2024) ..................................................8, 12

*Re/Max, LLC v. Quicken Loans Inc.*,
  295 F. Supp. 3d 1163 (D. Co. 2018).....................................................................20

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007).....................................................................................4

*SS&C Techs. Holdings, Inc. v. Arcesium LLC*,
  2024 WL 5186530 (S.D.N.Y. Dec. 20, 2024) ....................................15, 21, 22, 23

*U.S. v. Dubilier Condenser Corp.*,
  289 U.S. 178 (1933)..................................................................................................8

*UCB, Inc. v. Teva Pharms. USA, Inc.*,
  2015 WL 11199058 (N.D. Ga. Mar. 18, 2015)......................................................14

*United Pool Distrib., Inc. v. Custom Courier Sols., Inc.*,
  2024 WL 3621479 (W.D.N.Y. July 31, 2024).......................................................13

*In re Wands*,
  858 F.2d 731 (Fed. Cir. 1988).................................................................................12

*Xsolla (USA), Inc. v. Aghanim Inc.*,
  2024 WL 4139615 (C.D. Cal. Sept. 10, 2024) ......................................................20

*Yeda Rsch. and Dev. Co. Ltd. v. iCAD, Inc.*,
  2019 WL 4562409 (S.D.N.Y. Sept. 5, 2019)........................................................7, 9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Zabit v. Brandometry, LLC*,
    540 F. Supp. 3d 412 (S.D.N.Y. 2021).......................................................................................23

**Statutes**

18 U.S.C. § 1839.................................................................................................................7, 19
35 U.S.C. § 112.........................................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 12.......................................................................................................................5

## PRELIMINARY STATEMENT

This case is not about protecting trade secrets. It is about unlawfully maintaining a monopoly on a 30-year-old device with expired patents—and punishing ARS for using a "generic" version of that device developed by a competitor. Aptar wants to stop ARS from using a nasal spray device supplied by non-party Silgan Dispensing Systems ("Silgan") in ARS's innovative new product "neffy"—a single-dose emergency-use intranasal drug product that administers epinephrine through a nasal spray, offering a non-injectable alternative to products such as the EpiPen® to treat severe allergic reactions. For decades, Aptar has sold a device that is used to deliver a single emergency dose of a drug intranasally. By virtue of its patents, Aptar enjoyed a monopoly throughout that time, selling tens of millions of its devices worldwide in different nasal spray products. The expiration of Aptar's patents, however, has enabled generic competition for the sale of these devices, and one such competitor, Silgan, now offers a competing product. Aptar apparently does not welcome this competition and now seeks to weaponize trade secrets law to maintain its market dominance by making baseless and conclusory allegations that ARS ***must have*** disclosed Aptar's purported trade secrets to Silgan.

Aptar has not—and cannot—allege any actual evidence of misappropriation or improper use of confidential information. Instead, its Complaint for Breach of Contract and Trade Secret Misappropriation (ECF No. 1) ("Complaint"), is premised entirely on the theory that Silgan ***could not have*** made a competing product without using Aptar's trade secrets and that it ***must have*** received the trade secrets from ARS. But Aptar fails to offer any facts to support these conclusory assertions. All the information Silgan, or any other manufacturer, needed to develop its generic device without undue experimentation was publicly disclosed in Aptar's patents. Aptar's circumstantial allegations—based solely "on information and belief"—that it would have been impossible for Silgan to have developed its device without Aptar's trade secrets are implausible

1

and unsupported by facts. And even if Silgan received any confidential information about Aptar's device (and Aptar only speculates that it did), it is entirely speculative that Silgan received such information from ARS, as opposed to the many other individuals and entities that have had access to Aptar's confidential information over the years.

Aptar has enjoyed the limited-time monopoly over its device provided by patent law, but the *quid pro quo* for that monopoly was public disclosure. Aptar should not be permitted to improperly extend its monopoly in perpetuity by asserting baseless claims of trade secret misappropriation and breach of confidentiality. The Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

ARS is a biopharmaceutical company that specializes in the treatment of severe allergic reactions. (Compl. ¶ 20.) Its lead product, marketed as "neffy," is a single-dose emergency-use intranasal drug product that administers the well-known allergy medicament epinephrine through a nasal spray, offering a non-injectable alternative to products such as the EpiPen®, to treat severe (Type I) allergic reactions, including anaphylaxis. (*Id.* ¶ 5.) The U.S. Food and Drug Administration ("FDA") considers neffy a "combination product" that combines "a drug (epinephrine) with one nasal spray system/device." (*Id.* ¶ 10.) The FDA approved a 2-mg version of neffy on August 9, 2024, and a 1-mg version on March 5, 2025. (*Id.* ¶¶ 169, 178.) The European counterpart to neffy, EURneffy, was approved by the European Commission on August 22, 2024. (*Id.* ¶ 179.)

Aptar supplies ARS with parts to assemble a nasal spray system for neffy, which it calls the Unit Dose System liquid ("UDSl"). (*Id.* ¶ 1.) Aptar considers the UDSl one of the company's "crown jewels" and claims to have sold "tens of millions of UDSl systems" worldwide. (*Id.* ¶¶ 2, 44.) Specifically, Aptar alleges the UDSl has been used in at least eight FDA-approved

combination products dating back to 1997, including well-known products like Narcan®, which alone had more than 50 million prescriptions through 2022. (*Id.* ¶¶ 40, 44.)  The UDSl has also been used in "a number of approved generic versions of branded products" (*id.* ¶ 43), not to mention an unknown number of products that never reached the FDA-approval stage.

The Complaint does not deny that Aptar filed patent applications for the UDSl that expired in early 2020. (*Id.* ¶ 45.)  Instead, it contends "various aspects of the UDSl remain protected . . . by patents or pending patent applications," but does not identify which aspects remain protected, nor does it claim ARS infringed any patents. (*Id.*)

Aptar alleges it collaborated with ARS in the development and approval of neffy pursuant to several confidentiality agreements.  Pursuant to these agreements, Aptar allegedly provided ARS with seven categories of "confidential and trade secret information":  (1) the "identity of the resin used"; (2) the "fault tree analysis" submitted to the FDA; (3) "information about the dimensional tolerances"; (4) "information about the spray characterization, performance, and related FMEA [failure mode and effects analysis]"; (5) "information about the actuation force analysis, methodology, and related FMEA"; (6) "information about the mold design and testing methodology"; and (7) "information about the manufacturing and assembly controls." (*Id.* ¶¶ 192-227; *see id.* ¶¶ 49-82.)  There is no allegation that Aptar ever specifically identified any information provided to ARS as a "trade secret," and the Complaint does not distinguish which categories of information are "trade secrets" versus general "confidential information."

In addition to Aptar's UDSl, ARS uses a "generic" nasal spray system for neffy supplied by Silgan, "a consumer goods packaging company that provides containers, closures, and dispensing systems in the food and beverage, beauty, pet and home care, and healthcare sectors." (*Id.* ¶ 13.)  Silgan has experience producing dispensing systems for the healthcare sector and is a

well-resourced global company that "operat[es] 123 manufacturing facilities on four continents" with "over 17,200 employees and $6B in sales in 2024," making it larger than Aptar, which has only 48 manufacturing facilities and fewer than 13,000 employees. (*Id.* ¶ 19; Silgan Holdings Inc. Company Profile, https://www.silganholdings.com/about-silgan/company-profile/default.aspx (last visited June 12, 2025)).[1]

The Complaint alleges that prior to the emergence of Silgan as a supplier of neffy's nasal spray system, Aptar's UDSl "was the only single-dose intranasal system commercially available on the market for emergency-use applications." (Compl. ¶ 186.) Even after its patents expired, Aptar claims it was able to maintain its monopoly "because of high barriers to entry." (*Id.*) Aptar alleges that it first learned of the existence of a second supplier in ARS's March 2023 Form 10-K, when ARS disclosed "[t]he patent for the Aptar unit dose nasal spray device expired in early 2020, and we believe there will be generic supplies available soon after launch." (*Id.* ¶ 183.) By June 2024, ARS had allegedly represented to the European authorities that two manufacturers would supply the delivery system of EURneffy. (*Id.* ¶ 185.)

Counsel for Aptar sent ARS a series of letters accusing ARS of disclosing Aptar's trade secrets to Silgan. (Compl., Exs. G, I.) The letters cited no evidence of any misappropriation yet demanded various assurances and made requests for information. (*Id.*) On December 13, 2024, counsel for ARS unequivocally denied Aptar's accusations, stating: (1) "[ARS] at all times adhered to its contractual obligations with regard to Aptar's confidential information"; (2) "All

---

[1] The Court may consider Silgan's website because it is incorporated by reference in the Complaint. (Compl. ¶ 13 n.4.) *See MBC Fin. Servs. Ltd. v. Bos. Merchant Fin., Ltd.*, 2016 WL 5946709, at *10 n.10 (S.D.N.Y. Oct. 4, 2016) (incorporating by reference a website referred to in the complaint); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (noting that documents that are attached to the complaint or incorporated by reference are deemed part of the pleading and may be considered).

information on the second supplier in our applications comes exclusively from that supplier and no confidential information from Aptar was used to support the approval of the other supplier"; and (3) "FDA judged that each supplier's device was interchangeable based on independent data generated for each device by the supplier and [ARS]." (*Id.*, Ex. J.)  The Complaint does not allege any further communication between the parties until ARS's 10-K filing on March 20, 2025, when ARS disclosed Silgan was the second supplier.  (*Id.* ¶¶ 13, 182, 250.)  Aptar filed this lawsuit five days later.

ARS now brings this motion to dismiss the speculative and conclusory Complaint in its entirety.

## LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must provide grounds upon which their claim rests through 'factual allegations sufficient to raise a right to relief above the speculative level.'" *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *2 (S.D.N.Y. Jan. 23, 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "the complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Elsevier*, 2018 WL 557906 at *2 (quoting *Twombly*, 550 U.S. at 570).  The Court accepts as true all well-pled factual allegations, but "does not credit 'mere conclusory statements' or 'threadbare recitals of the elements of a cause of action.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "If the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not 'nudged plaintiff's claims across the line from conceivable to plausible'—dismissal is appropriate." *Id.* (quoting *Twombly*, 550 U.S. at 570).

"Courts in this Circuit look unfavorably upon conclusory pleadings made on information and belief." *Brodie v. Green Spot Foods, LLC*, 503 F. Supp. 3d 1, 13 (S.D.N.Y. 2020).  While

plaintiffs are permitted to plead facts "on information and belief," particularly where "facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible," "such allegations must be accompanied by a statement of the facts upon which the belief is founded." *GMH Cap. Partners v. Fitts*, 2025 WL 950674, at *10 (S.D.N.Y. Mar. 28, 2025). Indeed, "a litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *My Mavens, LLC v. Grubhub, Inc.*, 2023 WL 5237519, at *22 (S.D.N.Y. Aug. 14, 2023) (quoting *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018)).

## ARGUMENT

The Complaint asserts claims for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") and New York common law, as well as three breach of contract claims, all premised on the theory that ARS ***must have*** disclosed Aptar's purported trade secrets to Silgan because it "would not have been possible" for Silgan to have otherwise developed its competing device. But the Complaint fails to allege facts that sufficiently support any of these claims.

*First*, the DTSA claim fails because Aptar fails to plausibly allege that any of the information it claims was misappropriated is actually a trade secret. The UDSl device is, as Aptar admits, covered by patents, and Aptar could not have obtained those patents without disclosing all the information needed to make the device without undue experimentation. And to the extent any important information was not disclosed, Aptar fails to identify it with specificity. In any event, Aptar fails to allege any actual misappropriation. Its entire case rests on circumstantial allegations made "on information and belief" that ARS must have disclosed Aptar's trade secrets to Silgan. Those allegations do not come close to satisfying the federal pleading standard.

*Second*, the New York misappropriation claim fails for the same reasons as the DTSA claim and for the independent reason that it is duplicative of the breach of contract claims.

*Third*, the Court should decline to exercise supplemental jurisdiction over the breach of contract claims. But even if the Court retains jurisdiction, the Court must dismiss the claims because the alleged breaches are premised on the same speculative theory of misappropriation as the DTSA and New York common-law claims.

## I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE DEFEND TRADE SECRETS ACT

"To state a claim for misappropriation under the DTSA, a plaintiff must allege that it possessed a trade secret that the defendant misappropriated." *GMH Cap.*, 2025 WL 950674, at *5. Aptar fails to sufficiently plead either.

### A.    The Complaint fails to allege the existence of a trade secret.

To properly allege a claim for misappropriation of trade secrets, a plaintiff must first show that it possessed a trade secret. *Elsevier*, 2018 WL 557906, at *3-4. A "trade secret" is a "narrow category of confidential information," defined as information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* at *4 (quoting 18 U.S.C. § 1839(3)(B)). In assessing whether information constitutes a trade secret, courts generally consider several factors, the most important of which is "whether the information was secret." *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 514 (S.D.N.Y. 2017) (citing *Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 298 (2d Cir. 1986)).

Aptar fails to plausibly allege the existence of a trade secret because it chose to file patents on its UDSl device, thereby publicly disclosing the details of the invention. Courts have consistently held "[i]t is axiomatic that a plaintiff cannot recover for the misappropriation of a trade secret if he revealed that secret in a published patent or patent application." *Broker Genius*, 280 F. Supp. 3d at 518; *see Yeda Rsch. and Dev. Co. Ltd. v. iCAD, Inc.*, 2019 WL 4562409, at *5

(S.D.N.Y. Sept. 5, 2019) (dismissing a trade secret claim because the allegedly protectable trade secrets were covered by patents); *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F.Supp.3d 224, 267 (S.D.N.Y. 2014) (finding the plaintiff's information did not qualify as a trade secret because it was published in an Indian patent application from 2009).

Here, there is no dispute that the UDSl was covered by patents. (Compl. ¶ 45.) To obtain those patents, Aptar had to publicly disclose enough details about the UDSl to enable a "person of ordinary skill in the art" to make and use it "without undue experimentation." *PowX Inc. v. Performance Sols., LLC*, 2024 WL 3010040, at *11 (S.D.N.Y. June 14, 2024) (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)); *see* 35 U.S.C. § 112(a) (requiring a patent to include "a written description of the invention, and of the manner and process of making and using it, in such full, clear, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same"). Aptar claims that it would be impossible to create a generic version of the UDSl without its alleged trade secrets (Compl. ¶ 48), but if that is true, then those "trade secrets" would have had to have been disclosed in Aptar's patents to enable the public to make and use the device without undue experimentation and therefore, are not secret.

Aptar decided decades ago to forgo the secrecy of its UDSl in exchange for the legal right to a limited-time monopoly—"that is the quid for the quo of the patentee's exclusive right to make and sell the patented device." *Big Vision*, 1 F.Supp.3d at 269 (quoting *BondPro Corp. v. Siemens Power Gen., Inc.*, 463 F.3d 702, 706-07 (7th Cir. 2006)); *see Amgen Inc. v. Sanofi*, 598 U.S. 594, 605 (2023) (quoting *U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933)) ("So today, just as in 1790, the law secures for the public its benefit of the patent bargain by ensuring that, 'upon expiration of [the patent], the knowledge of the invention [i]nures to the people, who are thus

enabled without restriction to practice it.'"). Aptar benefitted greatly from that deal, selling "tens of millions" of UDSl devices around the world. (Compl. ¶¶ 2, 44.) Aptar cannot have it both ways by now claiming trade secret protection, essentially extending its expired patents indefinitely.

To the extent there is any valuable information about the design and manufacture of the UDSl that is not disclosed in Aptar's patents (and as explained above, there should not be), Aptar has not identified it. At the pleading stage, "New York and Second Circuit law . . . requires the trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed." *Elsevier*, 2018 WL 557906, at *4. Moreover, simply alleging that information is "confidential" is insufficient to confer trade secret status. *Yeda*, 2019 WL 4562409 at *5 ("'[C]onfidential information' is not equivalent to 'trade secrets.'"). A plaintiff must distinguish which information is a "trade secret" versus merely "confidential." *Benitez v. Valentino U.S.A., Inc.*, 2024 WL 1347725, at *19 (S.D.N.Y. Mar. 29, 2024) (finding the plaintiff failed to adequately specify trade secrets because "[w]hile [defendant's] descriptions of the documents certainly suggest that they are confidential, 'confidential information' is not equivalent to 'trade secrets'"). Indeed, this court has emphasized that "[f]or good reason, the law requires that before information or processes may be accorded trade secret status, it must be shown that it is truly a trade secret— a standard ***far greater*** than the standard for confidentiality of business information." *Elsevier*, 2018 WL 557906, at *5 (emphasis added).

Aptar does not meet this "far greater" standard. The Complaint purportedly identifies seven categories of "confidential and trade secret information": (1) the "identity of the resin used"; (2) the "fault tree analysis" submitted to the FDA; (3) "information about the dimensional tolerances"; (4) "information about the spray characterization, performance, and related FMEA"; (5) "information about the actuation force analysis, methodology, and related FMEA";

(6) "information about the mold design and testing methodology"; and (7) "information about the manufacturing and assembly controls."  (Compl. ¶¶ 192-227; *see id.* ¶¶ 49-82.)

These categories of information are broadly asserted and not protectable.  *See EVRYTHNG Ltd. v. Avery Dennison Retail Info. Servs., LLC*, 2021 WL 11592336, at *21 (S.D.N.Y. Aug. 2, 2021) (finding insufficient categories of information such as "technical information regarding the architecture and functions of the EVRYTHNG Product Cloud and related products and services," "pricing information for EVRYTHNG's platform, services and products (which are not available publicly but are tailored to the customer based on a standard framework)," "sales pipeline information," "customer lists," "product development plans" and "case study demonstrations"); *Elsevier*, 2018 WL 557906, at *6 (finding insufficient "ontology process and tools, including [defendant's] unique and proprietary process for 'binding' collecting original terms in a publication and then binding the like terms and synonyms to that original term").

Moreover, the Complaint identifies certain information as "confidential" (*see, e.g.*, Compl. ¶¶ 223-24 ("on information and belief, ARS directly or indirectly provided ***confidential information*** about the manufacturing and assembly controls of Aptar's UDSl to Silgan," and "Aptar has honed its ***confidential*** manufacturing processes over decades")), and interchangeably refers to that information as both "confidential" and "trade secrets" (*see, e.g.*, *id.* ¶¶ 190, 228 (alleging ARS disclosed Aptar's "confidential and trade secret information")).  But the Complaint does not specify what part, if any, falls within the "narrow category of confidential information" that qualifies as a "trade secret."  *GMH Cap.*, 2025 WL 950674, at *8 (dismissing complaint that "relies on broad categories of information which it refers to interchangeably as both trade secrets and confidential information" and where the alleged "trade secrets" were "the same 'confidential information' that [plaintiff] alleges was disclosed in breach of the NDA, however, [plaintiff] does

not identify any specific materials or documents or explain why these categories of information are trade secrets").

### B.    The Complaint fails to allege misappropriation.

Even if Aptar plausibly alleged the existence of trade secrets (which it does not), the DTSA claim fails for the independent reason that the Complaint does not sufficiently plead ARS misappropriated the purported trade secrets. To establish misappropriation under the DTSA, a plaintiff "must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of the disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such duty." *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016). Put another way, "[t]here are three ways to establish misappropriation under the DTSA: improper acquisition, disclosure, or use of a trade secret without consent." *Core SWX, LLC v. Vitec Grp. US Holdings, Inc.*, 2022 WL 3588081, at *9 (E.D.N.Y. July 14, 2022).

Here, Aptar alleges ARS improperly disclosed Aptar's trade secrets to Silgan, in violation of the confidentiality agreements. (Compl. ¶ 272.) However, the Complaint contains no evidence that ARS disclosed Aptar's trade secrets to Silgan or anyone. The Complaint merely repeats wholly conclusory allegations that—"on information and belief"—ARS has disclosed trade secrets to Silgan. (*See* Compl. ¶¶ 7, 12, 14, 165, 182, 190, 192, 196, 197, 199, 204, 207, 211, 220, 223, 228, 252, 272, 284, 293, 300, 307.) But "a litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *My Mavens*, 2023 WL 5237519, at *22. "These are precisely the kind of speculative 'naked assertion[s]' that are insufficient to survive a motion to dismiss." *See GMH Cap.*, 2025 WL 950674, at *10 (quoting *Iqbal*, 556 U.S. at 678) (dismissing complaint where plaintiff "simply repeats throughout the

complaint, on information and belief, that [defendant] shared [plaintiff's] confidential information and trade secrets without providing any factual support").

Instead of alleging any actual evidence of misappropriation, the Complaint relies entirely on the speculative theory that—"on information and belief"—the ***only way*** Silgan could have developed a competing product deemed "interchangeable" by the FDA is if ARS provided Silgan with Aptar's trade secrets.  Specifically, Aptar alleges "[o]n information and belief, ARS ***could not have*** received FDA approval for the use of a delivery system that is 'interchangeable' with Aptar's delivery system ***unless*** ARS unlawfully provided Aptar's trade secrets and confidential information to the second supplier, thereby facilitating the manufacture of the delivery system according to the confidential specifications of the UDSl."  (Compl. ¶ 12 (emphases added); *see id.* ¶ 228 (emphasis added) ("[I]n order for ARS to source an 'interchangeable' device with Aptar's UDSl, for purposes of FDA review and approval, ARS ***had to have*** improperly used, and did improperly use, Aptar's confidential and trade secret information and provided it to Silgan, without Aptar's knowledge or consent.").)  In support, the Complaint repeatedly relies on conclusory phrases like "could not have," "could not be," "had to have," "would have had to," and "would not have been possible," all asserted "on information and belief"—a phrase repeated ***62 times*** throughout the Complaint.  (*See id.* ¶¶ 12, 48, 193, 201, 205, 210, 219, 226, 228.)

As a threshold matter, Aptar's theory is facially implausible because, by definition, Aptar's patents contained enough information to allow a "person of ordinary skill in the art," such as Silgan, to make and use the UDSl "without undue experimentation."  *PowX*, 2024 WL 3010040, at *11 (quoting *Advanced Display*, 212 F.3d at 1282); *see Ferring Pharms. Inc. v. Serenity Pharms., LLC*, 2020 WL 4926458, at *51 (S.D.N.Y. Aug. 21, 2020) (quoting *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)) (explaining that patent law's "enablement" requirement mandates

that the patent "teach those in the art to make and use the invention without undue experimentation"). By opting for patent protection decades ago, Aptar enjoyed the fruits of a monopoly in exchange for publicly disclosing enough details to enable someone like Silgan to make a "generic" version of the UDSl "without undue experimentation." It is simply not credible for Aptar to now claim the "only way" Silgan could have developed its device is by using Aptar's purported trade secrets.

In any event, Aptar's circumstantial allegations are pure speculation. While a plaintiff may rely on circumstantial evidence to prove misappropriation, "a circumstantial-evidence approach still depends on a plausible underlying theory of misuse." *United Pool Distrib., Inc. v. Custom Courier Sols., Inc.*, 2024 WL 3621479, at *3 (W.D.N.Y. July 31, 2024). Allegations of misappropriation must be more than "circumstantial datapoints," which "may be enough to make an allegation possible, but not plausible." *Ad Lightning Inc. v. Clean.io, Inc.*, 2020 WL 4570047, at *2-3 (S.D.N.Y. Aug. 7, 2020) ("*Twombly* and *Iqbal*" require more than circumstantial allegations that are "merely consistent with [a defendant's] liability").

Here, Aptar's theory is based on a circumstantial "ladder of suppositions" that (1) because the FDA purportedly found the two devices "interchangeable," Silgan's device **must have** been created using Aptar's trade secrets; (2) the **only way** Silgan, a company that "had never produced a drug delivery system that was used in any FDA-approved emergency-use combination product," could have developed a competing product with Aptar on the alleged timeline is by using Aptar's trade secrets; and (3) ARS—rather than any of the indeterminable number of companies, entities and individuals in the biopharmaceutical industry with access to Aptar's alleged trade secrets— **must have** provided those trade secrets to Silgan. *My Mavens*, 2023 WL 5237519, at *23. Each

of these "must have" allegations, separately and together, fails to state a claim for misappropriation.

### 1. An FDA determination of "interchangeability" is irrelevant.

Aptar asserts that a finding by the FDA that two devices are "interchangeable" means the Silgan device must have been created using Aptar trade secrets. (*See* Compl. ¶ 12.) This does not follow. Even if the two devices are essentially "the same" as Aptar alleges, that in no way implies that the new device was created using any confidential or proprietary information. Analogizing to the patent context, courts have held that "[r]epresentations to the FDA that two products are similar or equivalent cannot, by themselves, establish that a product infringes a patent." *UCB, Inc. v. Teva Pharms. USA, Inc*., 2015 WL 11199058, at *13 (N.D. Ga. Mar. 18, 2015); *see Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1348 n.3 (Fed Cir. 2008) ("FDA equivalence is irrelevant to patent law because it involves fundamentally different inquiries."). Indeed, "if bioequivalency meant per se infringement, no alternative to a patented medicine could ever be offered to the public during the life of a patent." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009) (quoting *Abbott Lab'ys. v. Sandoz, Inc.*, 486 F. Supp. 2d 767, 776 (N.D. Ill. 2007)); *see Cerner Corp. v. Visicu, Inc.*, 2011 WL 27577, at *7 (W.D. Mo. Jan. 4, 2011) ("In order to gain FDA clearance under the 510(k) process, [defendant] was required to show that the vital signs capture component of the ARGUS System, was 'substantially equivalent' in its 'intended use' to a predicate device, *i.e.,* a device already proven safe and effective for the same intended use. An FDA finding that a device is 'substantially equivalent' to an existing device is not equivalent to a finding that the predicate device is material to patentability for purposes of inequitable conduct.").

Similarly, an FDA finding of "interchangeability" does not shed any light on whether Silgan used Aptar's trade secrets in developing its "generic" nasal spray system. An FDA

determination is a "fundamentally different inquiry" to whether a generic device was created using the existing device's confidential information. *Johns Hopkins Univ.*, 543 F.3d at 1348 n.3. To accept Aptar's argument would mean that no FDA-approved generic version of the UDSl device could be developed because such device "would have had to" have been developed with Aptar's trade secrets. The Court should reject such an expansive and unsupported application of trade secrets law.

At best, ARS's purported "admission" that the two devices are "interchangeable" is evidence of similarity, but "courts in this Circuit have declined to draw a reasonable inference of misappropriation even where a defendant launched a product that was 'materially identical in form, function, and operation' to plaintiff's product." *SS&C Techs. Holdings, Inc. v. Arcesium LLC*, 2024 WL 5186530, at *10 (S.D.N.Y. Dec. 20, 2024) (citing *Core SWX*, 2022 WL 3588081, at *2, 10). Any allegations of similarity thus become just a "circumstantial datapoint."

### 2.    The Complaint's other circumstantial allegations are insufficient.

Beyond product similarity (discussed above), Aptar cobbles together a smattering of other "circumstantial datapoints": (1) "Silgan had never produced a drug delivery system that was used in any FDA-approved emergency-use combination product" (Compl. ¶¶ 13, 191); (2) it took years for Aptar to develop its product, so a competitor would similarly have had to spend years developing a competing product (*id.* ¶¶ 46, 50, 56, 68, 71, 87, 191, 196, 204, 218); and (3) ARS had an economic motive to share the trade secrets to end Aptar's monopoly over the UDSl device (*id.* ¶ 182).

These allegations are simply insufficient to infer misappropriation. Two recent cases are illustrative. In *GMH Capital v. Fitts*, the complaint alleged Fitts (an employee of CBRE, a real estate company) received GMH confidential information as part of a team advising GMH on the purchase of certain real estate assets. 2025 WL 950674, at *10. Fitts secured the brokerage listing

for the real estate assets and recused herself from the GMH team because CBRE incentivized employees to broker deals rather than represent potential buyers in a transaction. *Id.* Fitts then allegedly notified a third party that the real estate assets were coming to market and assisted the third party in acquiring the assets by sharing GMH confidential information related to the assets, which the third party used to prepare its bid before the assets opened for public bidding. *Id.* The third party ultimately won the bid over GMH. *Id.*

This court found these allegations insufficient and dismissed the complaint, emphasizing that "GMH simply repeats throughout the complaint, on information and belief, that Fitts shared GMH's confidential information and trade secrets without providing any factual support." *Id.* The court rejected as "conclusory and unsupported by facts" GMH's circumstantial allegations that the third party "would not have been" able to submit a winning bid two weeks after the data room opened without obtaining GMH's confidential information. *Id.* It reasoned that "GMH merely asserts that the complexity of the bid and the travel limitations imposed by COVID-19 would have made the timing of the bid 'impossible,' but does not explain why." *Id.* The court concluded that "merely identifying Fitts as a recipient of alleged trade secrets, identifying a three-month time period in which the information could have been shared, and plainly alleging that the bid submitted by the [third party] could not have been possible without access to that information is purely speculative." *Id.* at 11.

In *Perimeter Solutions LP v. Fortress North America, LLC*, 2025 WL 553288 (E.D. Cal. Feb. 19, 2025), another court dismissed a similar complaint. That complaint alleged four circumstantial allegations of misappropriation: (1) defendant hired plaintiff's former VP of Operations who had access to plaintiff's trade secrets, (2) "defendant developed a product very similar to plaintiff's very quickly," (3) until defendant developed its product, only plaintiff had

managed to do so, and (4) after joining defendant the employee contacted the third-party engineer who had built plaintiff's production line. *Id.* at *7.

The court rejected each circumstantial allegation. First, regarding hiring the former employee, the court held "[a] defendant employee's mere knowledge of the plaintiff's alleged trade secrets is insufficient to constitute misappropriation." *Id.* Second, regarding the quick development of a similar product, plaintiff alleged defendant's development of the new product started after hiring the former employee in 2022, but the complaint also alleged "the timeline for qualifying a product" with the U.S. Forest Service is "long and complicated." *Id.* at *8. Thus, the "on information and belief" allegations that defendant started developing its product around when the former employee was hired, rather than earlier, is "conclusory, if not inconsistent with its alleged factual basis." *Id.* Plaintiff was thus left with allegations of similarity, but "merely alleging similarity between two products, without more, is insufficient to support a claim of misappropriation." *Id.* Third, regarding plaintiff's monopoly, the court reasoned, "[t]hat plaintiff enjoyed a lack of competition does not plausibly allege that no competitor could ever, through independent means, develop a competing product. Where the sole producer of a product with 'monopoly power' newly faces competition from a defendant developing a similar product, the plaintiff must allege facts that are not merely consistent with both a theory of innocent market entry and the theory that defendant used the plaintiff's trade secrets, but rather tend to exclude an innocent explanation." *Id.* at *8. Fourth, regarding defendant's contact of the third-party engineer that developed plaintiff's product, the court explained "[s]eeking out a plaintiff's qualified former employee or contractor to develop 'competitive products with similar features does not constitute wrongful conduct, but instead describes a market competitor,'" and emphasized "the risk that trade secret claims can be misused for anti-competitive purposes". *Id.* at *9 (quoting *CleanFish, LLC*

*v. Sims*, 2020 WL 1274991, at *11 (N.D. Cal. Mar. 17, 2020)).  The court then considered all the circumstantial allegations together and found them insufficient to plausibly allege misappropriation.  *Perimeter Sols.*, 2025 WL 553288, at *9.

The Complaint here suffers from the same defects.  Like in *GMH*, Aptar "simply repeats throughout the complaint, on information and belief, that [ARS] shared [Aptar's] confidential information and trade secrets without providing any factual support."  *GMH Cap.*, 2025 WL 950674, at *10.  Aptar argues the timing and Silgan's lack of experience would have made independent creation of Silgan's device "'impossible,' but does not explain why."  *Id.*  That is particularly telling where, like here, detailed information about the device was published in decades-old patents.  Moreover, Silgan's purported lack of experience is belied by the Complaint's own sources.  Silgan's website, which Aptar incorporates by reference (*see* Compl. ¶ 13 n.4), shows Silgan had the resources to independently develop its device—in 2024, Silgan had "123 manufacturing facilities on four continents, with over 17,200 employees and $6B in sales"—and has developed dozens of different pharmaceutical dispenser products.  (Silgan Holdings Inc. Company Profile, https://www.silganholdings.com/about-silgan/company-profile/default.aspx (last accessed June 12, 2025)).  The Complaint "merely identif[ies] [ARS] as a recipient of alleged trade secrets, identifies a three-[year] time period in which the information could have been shared, and plainly allege[s] that [the device developed by Silgan] could not have been possible without access to that information."  *GMH Cap.*, 2025 WL 950674, at *11.  That is "purely speculative."  *Id.*

Like in *Perimeter*, Aptar alleges Silgan developed a very similar product on a quick timeline.  But "merely alleging similarity between two products, without more, is insufficient to support a claim of misappropriation," and the timing allegations are conclusory.  *Perimeter*, 2025

18

WL 553288, at *7.  The Complaint does not allege when Silgan started developing its device but, as evidenced by the parties' experience with neffy, FDA approval can take years.  Thus, the assumption that Silgan must have begun developing its device between "2021 and August 2024," when "ARS had access to all of Aptar's trade secrets" (Compl. ¶ 186), rather than earlier, is "conclusory, if not inconsistent with its alleged factual basis."  *Perimeter*, 2025 WL 553288, at *7.  That assumption is especially speculative because enabling information has been contained in the UDSl's patents since the 1990s.

Also like in *Perimeter*, Aptar previously had a monopoly on its UDSl, but that "does not plausibly allege that no competitor could ever, through independent means, develop a competing product," *Perimeter*, 2025 WL 553288, at *7, especially when the details of that device have been disclosed in public patent applications since the 1990s and the device has been on the market for decades, easily obtainable at any drug store through over-the-counter products like Narcan®.  In fact, Aptar does not even allege it maintained its monopoly through trade secrets but "because of high barriers to entry."  (Compl. ¶ 186.)  It is implausible that a well-resourced company like Silgan could not have overcome those high barriers to entry and used publicly disclosed information to independently create a generic version of the UDSl, which is perfectly legal.  *See* 18 U.S.C. § 1839(6)(B) (excluding "reverse engineering, independent derivation, or any other lawful means of acquisition" from the definition of "improper means").

At best, the Complaint alleges facts that are "merely consistent with both a theory of innocent market entry and the theory that the defendant used the plaintiff's trade secrets."  *Perimeter*, 2025 WL 553288, at *7.  That is insufficient.  The facts here are actually even more speculative because unlike *Perimeter*, this case does not involve the hiring of a former employee,

where misappropriation through inevitable disclosure is arguably more plausible, than in the case where no former employee (or consultant) of ARS was hired by Silgan.

Courts across the country routinely dismiss such speculative "must have" allegations. *See Core SWX*, 2022 WL 3588081 at *10 (finding allegations that Core SWX had never previously created a micro battery product, but then within a year of hiring plaintiff's former employee developed a new micro battery "identical" to plaintiff's, were nothing more than "circumstantial datapoints"); *Xsolla (USA), Inc. v. Aghanim Inc.*, 2024 WL 4139615, at *10 (C.D. Cal. Sept. 10, 2024) (allegations that defendant accessed trade secrets, offered "eerily identical" services to plaintiff, and developed its applications "in record time" "do not support a plausible inference that [defendant] misappropriated [plaintiff's] trade secrets"); *Phazr, Inc. v. Ramakrishna*, 2019 WL 5578578, at *4-5 (N.D. Tex. Oct. 28, 2019) (dismissing complaint where plaintiff alleged defendant "***must*** have" acquired and used trade secrets by hiring plaintiff's employees, noting the fact that defendant lacked the capacity to develop a competing product before hiring plaintiff's employees "at best only reveals potential correlation, which is not actionable" (emphasis in original)); *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 6655274, at *9 (C.D. Cal. Sept. 23, 2019) ("Even when taken as true and in the light most favorable to Plaintiffs, the mere fact that a competitor markets a product faster than it took another competitor to develop their product, does not plausibly allege that the competitor's product must have been created with trade secrets"); *Re/Max, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1173 (D. Co. 2018) ("While Quicken Loans alleges various reasons to suspect RE/MAX was economically motivated to use Quicken Loans' confidential information . . . Quicken loans does not allege any facts tending to show that it actually did use such information."); *Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.*, 174 F. Supp. 3d 378, 390-91 (D.D.C. 2016) (finding speculative an allegation that "defendant

Corvus could not have submitted a competitive proposal . . . without utilizing [plaintiff's] Trade Secrets since, upon information and belief, Corvus had no experience bidding on performing contracts [at issue in the case]"); *Fortune Mfg. Co., Ltd. v. Zurn Indus., LLC*, 2011 WL 13220133, at *4 (C.D. Cal. Nov. 14, 2011) (granting summary judgment for a defendant who allegedly shared plaintiff's trade secrets with competing suppliers because plaintiff "provided [no] evidence that the only way its competitors could produce the number and quality of ball valves they are supplying to [defendant] is by using [plaintiff's] trade secrets"); *Joester Loria Grp. v. Licensing Co.*, 2011 WL 1642736, at *3 (S.D.N.Y. Apr. 29, 2011) (finding "[plaintiff's] allegations amount to mere speculation that [defendant] 'had to use proprietary and confidential information' in its submission to [third party]" and that "[s]uch guesswork is insufficient to state a claim").

### 3. The Complaint does not plausibly allege that ARS, rather than another source, disclosed Aptar's trade secrets to Silgan.

Finally, even assuming the Complaint plausibly alleged Silgan did develop its product using Aptar's trade secrets (it does not), it is rank speculation that ARS, rather than another source, disclosed the trade secrets. There is no allegation that ARS had exclusive access to Aptar's trade secrets. Instead, the Complaint alleges that the UDSl has been around for decades, was sold in tens of millions of products, and was used in at least eight FDA-approved combination products and "a number of generic versions of branded products," not to mention an unknown number of products that never made it past the FDA-approval stage. (Compl. ¶¶ 2, 13, 33, 40, 43-44.) That ARS—rather than one of the many other sources that possess Aptar's alleged trade secrets—disclosed the information to Silgan is purely conclusory.

***

Because Aptar has not—and cannot—allege any actual misappropriation, the Court should dismiss the Complaint with prejudice. *See, e.g.*, *SS&C Techs.*, 2024 WL 5186530, at *13

(dismissing DTSA claim with prejudice because "the court concludes that plaintiff does not allege facts that might support a reasonable inference that defendant misappropriated [trade secrets]").

## II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR MISAPPROPRIATION UNDER NEW YORK LAW

"The elements of misappropriation of trade secrets claims under federal and New York law are fundamentally the same." *GMH Cap.*, 2025 WL 950674, at *5.  Thus, the Court should dismiss the New York claim for the same reasons as the DTSA claim.  *See, e.g.*, *SS&C Techs.*, 2024 WL 5186530, at *14 ("For 'substantially the same reasons' that plaintiff fails to adequately plead a DTSA claim, plaintiff fails also to adequately plead a claim of trade secret misappropriation under New York law.").

The New York misappropriation claim must also be dismissed for an independent reason: it is duplicative of the breach of contract claims.  *See Converged Compliance Sols., Inc. v. XOP Networks, Inc.*, 2024 WL 4665114, at *11 (S.D.N.Y. Sept. 25, 2024) ("A misappropriation of trade secrets claim cannot rely on the same facts that underlie a breach of contract claim unless the plaintiff can allege that the defendant breached a duty *independent* of those covered under the contract." (emphasis in original)).

Here, Aptar's New York misappropriation claim is based on the same conduct underlying the breach of contract claims:  ARS's alleged disclosure of Aptar's trade secrets to Silgan in violation of various confidentiality agreements.  (*Compare* Compl. ¶ 284 ("ARS misappropriated Aptar's trade secrets by . . . disclosing such trade secrets to Silgan), *with* ¶¶ 293, 300, 307 ("ARS breached the [confidentiality agreements] by disclosing Aptar's confidential and proprietary information to Silgan").)  The Complaint "directly states that the information that was allegedly misappropriated was subject to the" confidentiality agreements, and "[b]y Plaintiff's own words, the only duty breached is the duty of nondisclosure under the" confidentiality agreements.

*Converged Compliance*, 2024 WL 4665114, at \*11.  Thus, the claim for misappropriation of trade secrets under New York law must be dismissed as duplicative of the breach of contract claims.

## III.    THE COMPLAINT FAILS TO STATE CLAIMS FOR BREACH OF CONTRACT

The Complaint asserts three claims for breach of various confidentiality agreements based on the same alleged conduct as the misappropriation claims:  ARS's alleged disclosure of Aptar's trade secrets to Silgan in violation of confidentiality agreements.  (Compl. ¶¶ 290-310.)  The Court should dismiss these claims as well.

*First*, the Court should decline to exercise supplemental jurisdiction.  "It is well-established . . . that generally 'when the federal claims are dismissed the state claims should be dismissed as well.'"  *Zabit v. Brandometry*, LLC, 540 F. Supp. 3d 412 (S.D.N.Y. 2021) (quoting *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998)); *MedQuest Ltd. v. Rosa*, 2023 WL 2575051, at \*8 (S.D.N.Y. Mar. 20, 2023) ("In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.")  Here, federal jurisdiction is premised on the DTSA claim.  (Compl. ¶ 22.)  Courts routinely decline supplemental jurisdiction when they have dismissed the DTSA claim.  *See, e.g.*, *GMH Cap.*, 2025 WL 950674, at \*11 (declining supplemental jurisdiction over breach of contract claims after dismissal of the DTSA claim); *SS&C Techs.*, 2024 WL 5186530, at \*14 (same).

*Second*, the breach of contract claims fail for the same reasons as the misappropriation claims.  Each of the contracts is governed by the laws of New York.  (Compl. ¶¶ 121, 145, 161.)  Under New York law, the elements of a breach of contract claim are (1) existence of a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages suffered as a result of the breach.  *Converged Compliance*, 2024 WL 4665114, at \*5.  Here, the

Complaint's theory of breach is based on the same conduct underlying the misappropriation claims—ARS "disclosing Aptar's confidential and proprietary information to Silgan for the benefit of ARS."  (Compl. ¶¶ 293, 300, 307.)  Thus, the Complaint fails to allege breach of the confidentiality agreements for the same reasons it fails to allege misappropriation—the theory that ARS ***must have*** provided Aptar's trade secrets to Silgan is entirely speculative.  (*See* Section I.B, *supra*.)

## **CONCLUSION**

For the foregoing reasons, ARS respectfully requests that the Court grant its motion to dismiss with prejudice.

Dated:  June 12, 2025

COOLEY LLP

By: /s/ *Philip M. Bowman*

Philip M. Bowman (SBN 4039129)
Rona Proper (SBN 6023253)
Brian Golger (SBN 5899240)
Ann Jacob (SBN 6023253)
55 Hudson Yards
New York NY 10001-2163
Tel: (212) 479-6000
Fax: (212) 479-6275
pbowman@cooley.com
rproper@cooley.com
bgolger@cooley.com
ajacob@cooley.com

Ken Rollins (*pro hac vice*)
W. Chad Shear (*pro hac vice*)
10265 Science Center Drive
San Diego, CA  92121-1117
Tel: (858) 550-6000
Fax: (858) 550-6420
krollins@cooley.com
cshear@cooley.com

Laura Elliott (*pro hac vice*)
110 N. Wacker Drive, Suite 4200
Chicago, IL 60606
Tel: (312) 881-6500
Fax: (312) 881-6598
lelliott@cooley.com

*Attorneys for Defendants ARS*
*Pharmaceuticals, Inc. and ARS*
*Pharmaceuticals Operations, Inc.*