# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

APTARGROUP, INC. and APTAR FRANCE SAS,

    Plaintiffs,

    v.

ARS PHARMACEUTICALS, INC. and ARS
PHARMACEUTICALS OPERATIONS, INC.

    Defendants.

Civil Action No. 1:25-cv-02545-DEH-SLC

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................1

II.   SUMMARY OF THE FACTS ..................................................................2

III.  LEGAL STANDARD ..............................................................................5

    A.    Pleading Standard ........................................................................5

    B.    Trade Secret Misappropriation......................................................6

    C.    Trade Secrets and Patents .............................................................6

IV.   ARGUMENT ..........................................................................................7

    A.    Aptar plausibly alleges a claim of trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"). ..........................................7

        1.    The Complaint goes well beyond what is required in this Circuit to allege that Aptar possesses trade secrets.....................................8

            i.    Aptar pleads sufficient facts demonstrating that trade secrets exist. .................................................................8

            ii.    Aptar's patents are not inconsistent with an actionable trade secret misappropriation claim. ......................................11

        2.    Aptar more than plausibly pleads that ARS misappropriated Aptar's trade secrets through a comprehensive set of factual allegations. ............................................................................13

            i.    ARS had the opportunity and motive to disclose Aptar's trade secrets to a second manufacturer...........................14

            ii.    ARS's second supplier had no previous experience in manufacturing devices in this highly technical and highly regulated field. ..........................................................15

            iii.    ARS's second supplier developed an "interchangeable" device to Aptar's UDSl on the precise timing that ARS stood to benefit from the entry into the market of a second supplier....................................................................17

            iv.    All reasonable inferences from these allegations support a claim of misappropriation by ARS. ..............................20

    B.    Aptar plausibly alleges a claim for trade secret misappropriation under New York Law ..........................................................................24

    C.    Aptar plausibly alleges claims of breach of contract under New York Law..........25

    D.    If the Court grants ARS's Motion to Dismiss, Aptar should be granted leave to amend ..........................................................................25

i

V.      CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys. v. Sandoz, Inc.*,
    486 F. Supp. 2d 767 (N.D. Ill. 2007) ..................................................................19

*Abbott Labs. v. Sandoz, Inc.*,
    566 F.3d 1282 (Fed. Cir. 2009) ...........................................................................19

*Ad Lightning Inc. v. Clean.io, Inc.*,
    2020 WL 4570047 (S.D.N.Y. Aug. 7, 2020) ........................................................23

*Allergan, Inc. v. Revance Therapeutics, Inc.*,
    711 F. Supp. 3d 873 (M.D. Tenn. 2024).........................................................20, 21

*Amimon Inc. v. Shenzhen Hollyland Tech Co.*,
    2021 WL 5605258 (S.D.N.Y. Nov. 30, 2021) ........................................................5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................5

*BAE Sys. Info. & Elec. Sys. Integration Inc. v. L3Harris Cin. Elecs. Corp.*,
    716 F. Supp. 3d 206 (S.D.N.Y. 2024)..................................................................17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................5

*Benitez v. Valentino U.S.A. Inc.*,
    2024 WL 1347725 (S.D.N.Y. Mar. 29, 2024) ......................................................10

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
    489 U.S. 141 (1989)................................................................................................6

*Broker Genius, Inc. v. Zalta*,
    280 F. Supp. 3d 495 (S.D.N.Y. 2017)...................................................................11

*Catalyst Advisors L.P. v. Catalyst Advisors Invs. Glob. Inc.*,
    602 F. Supp. 3d 663 (S.D.N.Y. 2022)..............................................................10, 12

*Cerner Corp. v. Visicu, Inc.*,
    2011 WL 27577 (W.D. Mo. Jan. 4, 2011) ............................................................19

*Chevron U.S.A., Inc. v. Roxen Serv., Inc.*,
    813 F.2d 26 (2d Cir. 1987)....................................................................................12

*Christianson v. Colt Indus. Operating Corp.*,
    822 F.2d 1544 (Fed. Cir. 1987) ........................................................................7, 11, 12

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988).................................................................................................7

*Christianson v. Colt Indus. Operating Corp.*,
    870 F.2d 1292 (7th Cir. 1989) ..........................................................................7, 11

*Core SWX, LLC v. Vitec Grp. US Holdings, Inc.*,
    2022 WL 3588081 (E.D.N.Y. Jul. 14, 2022) ........................................................23

*DiBlasio v. Novello*,
    344 F.3d 292 (2d Cir. 2003).....................................................................................5

*In re Dr. Reddy's Labs., Ltd.*,
    2002 WL 31059289 (S.D.N.Y. Sept. 13, 2002)....................................................20

*Dur-A-Flex, Inc. v. Dy*,
    321 A.3d 295 (Conn. 2024) ......................................................................................9

*Eastman Chem. Co. v. AlphaPet Inc.*,
    2011 WL 5402767 (D. Del. Nov. 4, 2011) ...........................................................15

*Elsevier Inc., v. Dr. Evidence, LLC*,
    2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ..........................................................10

*Engine Cap. Mgmt., LP v. Engine No. 1 GP LLC*,
    2021 WL 1372658 (S.D.N.Y. Apr. 10, 2021)..........................................................9

*EVRYTHNG Ltd. v. Avery Dennison Retail Info. Servs., LLC*,
    2021 WL 11592336 (S.D.N.Y. Aug. 2, 2021) .........................................................9

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)......................................................................................9

*Fortune Mfg. Co. v. Zurn Indus., LLC*,
    2011 WL 13220133 (C.D. Cal. Nov. 14, 2011)....................................................23

*Fuentes-Fernandez & Co., PSC v. The Corvus Grp.*,
    174 F. Supp. 3d 378 (D.D.C. 2016) ......................................................................23

*GMH Cap. Partners v. Fitts*,
    2025 WL 950674 (S.D.N.Y. Mar. 28, 2025) ........................................................22

*Hedgeye Risk Mgmt., LLC v. Dale*,
    2023 WL 6386845 (S.D.N.Y. Sep. 29, 2023)........................................................25

*Impax Media, Inc. v. Ne. Advert., Corp.*,
  2018 WL 3962841 (S.D.N.Y. Aug. 17, 2018) .......................................................................21

*Insulet Corp. v. EOFlow Co., Ltd.*,
  755 F. Supp. 3d 70 (D. Mass. 2024) ...................................................................................9

*iSentium, LLC v. Bloomberg Fin. L.P.*,
  2018 WL 6025864 (S.D.N.Y. Nov. 16, 2018) ..............................................................13, 25

*Joester Loria Grp. v. Licensing Co.*,
  2011 WL 1642736 (S.D.N.Y. Apr. 29, 2011).......................................................................23

*Johns Hopkins Univ. v. Datascope Corp.*,
  543 F.3d 1342 (Fed Cir. 2008) ...........................................................................................19

*Kewanee Oil Co. v. Bicron Corp.*,
  416 U.S. 470 (1974)..........................................................................................................6, 7

*Lavvan, Inc. v. Amyris, Inc.*,
  2021 WL 3173054 (S.D.N.Y. July 26, 2021) ............................................................ *passim*

*Lessin v. Ford Motor Co.*,
  2024 WL 4547374 (S.D. Cal. June 14, 2024)......................................................................9

*M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*,
  2019 WL 6655274 (C.D. Cal. Sept. 23, 2019) ...................................................................23

*Masimo Corp. v. Apple Inc.*,
  2024 WL 4800663 (C.D. Cal. Aug. 7, 2024).........................................................................7

*Medidata Sols., Inc. v. Veeva Sys.*,
  2018 WL 6173349 (S.D.N.Y. Nov. 26, 2018) ..............................................................17, 20

*Medtech Prods. v. Ranir, LLC*,
  596 F. Supp. 2d 778 (S.D.N.Y. 2008) ...............................................................................17

*Metso Mins. Indus., Inc. v. FLSmidth-Excel LLC*,
  733 F. Supp. 2d 990 (E.D. Wis. 2010)...............................................................................12

*Next Commc'ns, Inc. v. Viber Media, Inc.*,
  2016 WL 1275659 (S.D.N.Y. Mar. 30, 2016) ..................................................................6, 24

*Nielsen Consumer LLC v. Circana Grp., L.P.*,
  2023 WL 5917751 (S.D.N.Y. Sept. 11, 2023)......................................................................8

*OmniProphis Corp. v. Vanteon Corp.*,
  2024 WL 3443900 (W.D.N.Y. July 17, 2024)......................................................................24

*Oneida Grp., Inc v. Steelite Int'l U.S.A., Inc.*,
  2017 WL 6459464 (E.D.N.Y. Dec. 15, 2017) .......................................................................5

*Onyx Renewable Partners L.P. v. Kao*,
  2023 WL 405019 (S.D.N.Y. Jan. 25, 2023) ..........................................................................6

*Perimeter Solutions, LP v. Fortress North America, LLC*,
  2025 WL 553288 (E.D. Cal. Feb. 19, 2025)........................................................................22

*Phazr, Inc. v. Ramakrishna*,
  2019 WL 5578578 (N.D. Tex. Oct. 28, 2019) ....................................................................23

*RE/MAX, LLC v. Quicken Loans Inc.*,
  295 F. Supp. 3d 1163 (D. Colo. 2018)................................................................................23

*Reckitt Benckiser Inc. v. Tris Pharma, Inc.*,
  2011 WL 773034 (D.N.J. Feb. 28, 2011) ...........................................................................20

*Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*,
  2024 WL 3835264 (S.D.N.Y. Aug, 14, 2024)....................................................................25

*Simport Plastiques, Ltd. v. Imprint Genetics Corp.*,
  2008 WL 11470805 (S.D. Fla. 2008) ...................................................................................9

*Smart Surgical, Inc. v. Utah Cord Bank, Inc.*,
  2021 WL 734954 (D. Utah Feb. 25, 2021) .........................................................................15

*SS&C Techs. Holdings, Inc. v. Arcesium LLC*,
  2024 WL 5186530 (S.D.N.Y. Dec. 20, 2024) ....................................................................20

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group Inc.*,
  68 F.4th 792 (2d Cir. 2023) ..................................................................................................8

*Tesla Wall Sys., LLC v. Related Cos., L.P.*,
  2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017) .................................................................8, 10

*True Velocity Ammunitions, LLC v. Sig Sauer, Inc.*,
  2024 WL 4583118 (D. Vt. Oct. 25, 2024) ..........................................................................24

*UCB, Inc. v. Teva Pharms. USA, Inc.*,
  2015 WL 11199058 (N.D. Ga. Mar. 18, 2015) ..............................................................18, 19

*Uni-Sys., LLC v. U.S. Tennis Ass'n, Inc.*,
  350 F. Supp. 3d 143 (E.D.N.Y. 2018) ................................................................................12

*Xsolla (USA), Inc. v. Aghanim Inc.*,
  2024 WL 4139615 (C.D. Cal. Sept. 10, 2024) ...................................................................23

**Statutes**

18 U.S.C. § 1839(3) .................................................................................................................6

18 U.S.C. § 1839(5) .................................................................................................................6

I.    **<u>INTRODUCTION</u>**

This lawsuit seeks redress for ARS's theft of trade secrets related to Aptar's proprietary UDSl drug delivery system—a system used tens of millions of times for delivery of FDA-approved emergency-use medicines.  As detailed in the Complaint, Aptar was engaged by ARS to assist with the development of neffy, including by providing ARS with confidential access to trade secrets necessary to manufacture Aptar's UDSl—the only device available that met the FDA's 99.999% reliability standard.  Unbeknownst to Aptar, ARS was at the same time unlawfully funneling those trade secrets—which are essential to neffy's reliability rating—to ***another*** manufacturer to produce a clone of Aptar's UDSl.  As ARS reaps significant commercial success from its unlawful conduct, Aptar will suffer significant harm that its well-pleaded Complaint will remedy.

ARS moves to dismiss the Complaint on the ground that Aptar fails to state its claims with sufficient particularity, but fails to engage meaningfully with Aptar's detailed description of its trade secrets or address the compelling set of inferences that are logically drawn from Aptar's allegations.  Those include that ARS had long-standing access to Aptar's trade secrets in the course of its business relationship, had made commercial demands of Aptar that were unreasonable, and had publicly articulated the goal of replacing Aptar's UDSl with a generic device.  Nor does ARS engage with what would otherwise be a remarkable number of coincidences alleged in the Complaint, including that ARS chose, in Silgan, a company that had never before manufactured a device in the emergency-use category and yet managed, on a timetable that was beneficial to ARS, to produce one that was "interchangeable" with the UDSl, and therefore could meet the FDA's exacting reliability standards—a feat no other company had accomplished.  That is because all ***reasonable*** inferences drawn in Plaintiffs' favor are more than sufficient to satisfy the pleading standards.

Although ARS's narrative is that Aptar seeks to maintain a monopoly over the UDSl, even

1

after its patents allegedly expired in 2020, neither the Complaint nor the law supports it. ARS misstates the intersection of patent and trade secret law, improperly suggesting that the two are entirely coextensive. That is not so. Any company was free to manufacture a competitor device to the UDSl by expending its own time and resources to achieve FDA-level reliability for mass production. Aptar seeks to ensure only that ARS competes fairly, rather than by misappropriation. ARS's motion to dismiss should be denied.

## II.    **SUMMARY OF THE FACTS**

Aptar's UDSl is a single-use, intranasal delivery system that is the result of decades of research and development at a cost of millions of dollars. Compl. ¶¶ 40, 46, 83-88. This revolutionary device has been relied on for years with emergency-use drugs. *Id.* ¶ 40. The design and manufacture of the UDSl has evolved steadily to meet market and regulatory demands. *Id.* ¶¶ 33-35. Among other important attributes, the current version of the UDSl allows Aptar's customers to meet the 99.999% reliability standard articulated by the FDA in 2020 for emergency-use drug-delivery devices. *Id.* ¶¶ 58-62.

Critical to the success of the UDSl is Aptar's proprietary and confidential manufacturing and design know-how, which has allowed Aptar to overcome technological barriers to entry that would-be competitors have not. *Id.* ¶¶ 80, 186. That confidential information includes trade secrets, seven of which are described in detail in the sealed Complaint: (A) device composition and tolerances trade secrets (which include (1) *polymer/resin composition* (*id.* ¶¶ 49-53) and (2) *dimensional tolerances* (*id.* ¶¶ 54-57)); (B) device reliability trade secrets (which include (3) *fault tree analysis* (*id.* ¶¶ 58-62), (4) *spray characterization, performance, and related FMEA* (*id.* ¶¶ 63-66), and (5) *actuation force analysis, methodology, and related FMEA* (*id.* ¶¶ 67-70)); and (C) device manufacturing trade secrets (which include (6) *mold design and testing* (*id.* ¶¶ 71-75), and (7) *manufacturing and assembly controls and conditions* (*id.* ¶¶ 76-82)). Each of these trade

2

secrets plays a role in the successful mass manufacturing of a device that meets the FDA's 99.999% reliability standard and other regulatory standards. *Id*. ¶¶ 46, 196, 200, 205, 226.

Aptar and ARS began a business relationship in 2015 (*id*. ¶¶ 106-113) that has been at all times governed by strict confidentiality obligations to which ARS agreed. *Id.* ¶¶ 106-169. That relationship evolved into the development of a product for the intranasal delivery of epinephrine, as reflected in a Statement of Work ("SOW") executed by the parties in July 2020. *Id*. ¶¶ 114-117. The SOW contemplated the eventual commercial delivery of the UDSl, as well as the delivery of documents and services to support the regulatory approval of the combination product now branded as neffy. *Id*. ¶¶ 118, 122, Ex. B (including Exhibit A therein (listing deliverables)). By early 2021, Aptar had given ARS access to documents containing Aptar trade secret information, which ARS was obligated to keep secret. *Id.* ¶¶ 119-120, 123-124. Those documents are described in the Complaint, along with the seven trade secrets that those documents contain. *Id*. ¶¶ 124-134.

In August 2022, ARS submitted its neffy New Drug Application ("NDA") to the FDA (*id*. ¶ 137), which ARS touts as comprising a drug (epinephrine) and Aptar's UDSl device. *Id*. ¶¶ 230-235. During the regulatory review period that followed, Aptar continued to support ARS by providing additional documents and services (*id*. ¶¶ 138-139, 148-153) as well as arranging for an on-site visit by ARS to Aptar's facilities in France in 2023 (*id*. ¶¶ 157-165), providing ARS additional access to Aptar's trade secrets. *Id*. ¶ 164. With Aptar's support and backed by the UDSl's stellar track record, neffy received FDA approval in August 2024. *Id*. ¶¶ 176-179.

During the parties' collaboration, ARS's Founder, President, and CEO, Richard Lowenthal, at times demanded better commercial terms from Aptar and threatened to find another delivery device supplier, while also acknowledging that no other company had come close to offering Aptar's highly reliable single-dose emergency-use delivery system. *Id*. ¶ 181. But once ARS had

received the benefit of Aptar's trade secret information, ARS began to downplay Aptar's significant contributions to neffy, stating in 2023 and 2024 SEC filings that Aptar's "patent for the [UDSl] device expired in early 2020" and that "there will be generic supplies available soon after launch." *Id.* ¶¶ 183-184. By June 2024, public filings revealed ARS's apparent plan to have two separate manufacturers supply the delivery device for neffy. *Id.* ¶ 185. Ultimately, ARS made the shocking admission that Aptar's UDSl was deemed by the FDA to be "interchangeable" with a device supplied by a then-undisclosed second manufacturer (*id.* ¶ 189; ECF No. 39 ("Mot.") at 5), which made it clear to Aptar that its trade secrets had been misappropriated.

In March 2025, ARS acknowledged publicly that the second supplier was Silgan, a company that, to Aptar's knowledge, has never before manufactured a drug delivery system in an FDA-approved emergency-use combination product. *Id.* ¶¶ 190-191.[1] Silgan's lack of relevant experience makes the misappropriation case against ARS even stronger because, by definition, the FDA's approval of neffy constitutes the approval of one drug with ***one device*** (the UDSl)—not with ***two*** similar, or "equivalent," devices. *Id.* ¶ 10. And that one single device is being manufactured by two different suppliers (*id.* ¶ 11): Aptar, with a proven history and track record (*id.* ¶¶ 34, 40, 44), and Silgan, with neither. *Id.* ¶ 191. The essential nature of each of Aptar's trade secrets to the performance and reliability of the UDSl leads to the inexorable conclusion that, for ARS to have sourced an "interchangeable" clone of Aptar's UDSl meeting the 99.999% reliability standard, ARS had to improperly use Aptar's trade secrets, including by providing them to Silgan without Aptar's knowledge or consent. *Id.* ¶¶ 192, 199, 204, 207, 211, 220, 223, 228.

---

[1] *See Investor Relations Presentation*, SILGAN HOLDINGS INC. (June 2025) https://www.silganholdings.com/investor-information/events-and-presentations/presentations/default.aspx (providing overview of product portfolio and indicating Health Care segment as constituting 5% of 2024 company revenue).

That is, such "interchangeability" was unachievable without Aptar's trade secrets, as alleged in detail in the Complaint with respect to each of Aptar's trade secrets. *See id.* ¶¶ 189-227.  ARS's marketing of the UDSl and the alleged Silgan clone as one and the same only confirms that ARS used Aptar's trade secrets to ensure that the devices are, in fact, the same. *Id.* ¶¶ 216, 230-233.

While ARS privately disparaged Aptar's trade secret protections after having incorporated the UDSl into its neffy NDA (*id.* ¶¶ 238-249), it has publicly flaunted, with investors and regulators, the Aptar UDSl's reliability as well as its broad acceptance in the emergency-use market, touting its use in multiple FDA-approved products and tens of millions of prescriptions. *Id.* ¶¶ 216, 229-235.  ARS has at the same time been euphoric about the commercial future of neffy, describing it as having "blockbuster" potential and foreshadowing billions of dollars in sales. *Id.* ¶¶ 253-259.

## III.  LEGAL STANDARD

### A.  Pleading Standard

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[D]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Oneida Grp., Inc v. Steelite Int'l U.S.A., Inc.*, 2017 WL 6459464, at *5 (E.D.N.Y. Dec. 15, 2017).

In considering a motion to dismiss, "the Court is required to 'accept as true the facts alleged in the Complaint, drawing all reasonable inferences in favor of the plaintiff.'" *Amimon Inc. v. Shenzhen Hollyland Tech Co.*, 2021 WL 5605258, at *9 (S.D.N.Y. Nov. 30, 2021).  Disputed issues of fact are inappropriate to consider on a motion to dismiss. *DiBlasio v. Novello*, 344 F.3d

292, 304 (2d Cir. 2003). Pleading on information and belief is appropriate to survive a motion to dismiss where "facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Lavvan, Inc. v. Amyris, Inc*., 2021 WL 3173054, at *5 (S.D.N.Y. July 26, 2021).

### B.    Trade Secret Misappropriation

The DTSA defines a trade secret as "all forms" of "scientific, technical, . . . or engineering information, including . . . formulas, designs, prototypes, methods, techniques, processes, procedures, . . . whether tangible or intangible, and whether or how stored." 18 U.S.C. § 1839(3).

Misappropriation is "acquisition of a trade secret [through] improper means," or "disclosure or use of a trade secret of another without . . . consent." 18 U.S.C. § 1839(5). "[M]isappropriation is regularly proved by circumstantial evidence, and [] such evidence does not fail to state a DTSA claim as a matter of law." *Onyx Renewable Partners L.P. v. Kao*, 2023 WL 405019, at *5 (S.D.N.Y. Jan. 25, 2023); *see also Next Commc'ns, Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *5 (S.D.N.Y. Mar. 30, 2016) (misappropriation may be pled "on information and belief" since it is "expected that Plaintiffs would have limited knowledge of the extent to which [a defendant] has used their trade secrets.").

### C.    Trade Secrets and Patents

Patent law and trade secret law are "two systems [that] are not and never would be in conflict" as each body of law has a "particular role to play, and the operation of one does not take away from the need for the other." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 484, 493 (1974); *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 155-56 (1989). Trade secret law fosters competition "in areas where patent law does not reach" and promotes "standards of commercial ethics" by protecting trade secret owners from those "who by unfair means . . . obtain[] the desired knowledge without [themselves] paying the price in labor, money,

6

or machines expended by the discover[er]." *Kewanee Oil*, 416 U.S. at 481-82, 485.

"The subject of . . . trade secrets must be technically different from . . . publicly disclosed patent claims. This is just the nature of trade secrets and patents. . . . There is limited, if any, overlap because trade secrets derive their value from being secret and patents must be publicly disclosed in exchange for the right to exclude." *Masimo Corp. v. Apple Inc.*, 2024 WL 4800663, at *3 (C.D. Cal. Aug. 7, 2024). For instance, patents can protect parts of a device while trade secrets protect the specifications necessary to mass-produce and commercialize that device. *See Christianson v. Colt Indus. Operating Corp.*, 822 F.2d 1544, 1561-63 (Fed. Cir. 1987) (vacated on jurisdictional grounds in *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988)); *see also Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292, 1298-1301 (7th Cir. 1989) (agreeing with the Federal Circuit's holding). This is because "nothing in the patent law requires that a patentee must disclose data on how to mass-produce the invented product, in patents obtained on either individual parts of the product or on the entire product. Thus, the law has never required that a patentee who elects to manufacture its claimed invention must disclose in its patent the dimensions, tolerances, drawings, and other parameters of mass production not necessary to enable one skilled in the art to practice (as distinguished from mass-produce) the invention." *Christianson*, 822 F.2d at 1562 (Fed. Cir. 1987) (citations omitted).

## IV.    ARGUMENT

### A.    Aptar plausibly alleges a claim of trade secret misappropriation under the Defend Trade Secrets Act ("DTSA").

ARS seeks to dismiss at the pleading stage the entirety of Aptar's DTSA claim, first arguing that Aptar "fail[ed] to plausibly allege the existence of a trade secret." Mot. at 7. As set forth more fully below, ARS ignores both the extensive allegations in the Complaint and the pleading standard, as well as relies on cases that are inapposite. ARS further seeks to have the Court draw

inferences in ARS's favor by making factual findings regarding whether Aptar's trade secrets were publicly disclosed in unspecified Aptar patents, which is impermissible on a motion to dismiss. ARS's arguments go to the merits, not the pleadings, and are improper at this stage.

        1.    **The Complaint goes well beyond what is required in this Circuit to allege that Aptar possesses trade secrets.**

ARS does not challenge the sufficiency of Aptar's allegations regarding the many protective measures it has taken to ensure that its confidential information remains secret, or the independent economic value derived from that information.[2] Rather, ARS makes two arguments which both fail at the motion to dismiss stage.

        i.    *Aptar pleads sufficient facts demonstrating that trade secrets exist.*

ARS first offers the conclusory assertion that Aptar failed to sufficiently plead the existence of a trade secret because its alleged trade secrets are "broadly asserted and not protectable." Mot. at 10. Aptar's alleged trade secrets are not set forth in a laundry list of generalized items, such as customer lists or marketing materials, which is the defect in pleadings typically found at this stage of litigation. Rather, Aptar spends ***thirty-four paragraphs*** describing in significant detail seven highly technical trade secrets at issue necessary to the manufacture of the UDSl. Compl. ¶¶ 49-82. The Complaint even describes exemplary documents containing those trade secrets. *Id*. ¶¶ 128-134, 151-153. This is more than sufficient specificity to survive a motion to dismiss. *See Nielsen Consumer LLC v. Circana Grp., L.P.*, 2023 WL 5917751, at *7 (S.D.N.Y. Sept. 11, 2023) (trade secrets "identified with specificity where a party 'identified the trade secrets by name, described them in detail, [and] tied them to specific documents'") (quoting *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group Inc.*, 68 F.4th 792, 802 (2d Cir. 2023)); *Tesla Wall Sys.*,

---

[2] The Complaint alleges that "Aptar has spent decades and millions of dollars developing and refining" the trade secrets behind the UDSl and undertakes security measures, including password protection, and access restrictions. Compl. ¶¶ 3, 83, 86, 89-95.

*LLC v. Related Cos., L.P.*, 2017 WL 6507110, at \*9 (S.D.N.Y. Dec. 18, 2017) (complaint pled "numerous specific categories of information such as 'technical data, . . . work product, research, [and] engineering designs'").

There is also a significant body of case law, overlooked by ARS, concluding that the very trade secrets identified by Aptar have been found protectable. *See, e.g.*, *Dur-A-Flex, Inc. v. Dy*, 321 A.3d 295, 336-38 (Conn. 2024) ("**resin** formula" was a trade secret); *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (drawings containing "**dimensions and tolerances** . . . and special instructions for manufacturing, testing, and assembly" contained trade secrets); *Lessin v. Ford Motor Co.*, 2024 WL 4547374, at \*4 (S.D. Cal. June 14, 2024) ("**root cause analysis**" (which is akin to a **fault tree analysis**) was a trade secret); *Insulet Corp. v. EOFlow Co., Ltd.*, 755 F. Supp. 3d 70, 92-93 (D. Mass. 2024) ("design history file" which included plaintiff's "Failure Modes Effects Analysis" (**FMEA**) was a trade secret); *Simport Plastiques, Ltd. v. Imprint Genetics Corp.*, 2008 WL 11470805, at \*3 (S.D. Fla. 2008) (finding "proprietary **molds**" protectable trade secrets for purposes of granting temporary restraining order); *Dur-A-Flex*, 321 A.3d at 338 ("**manufacturing process**" was a trade secret) (emphases added). If such information can be protectable as trade secrets, Aptar has (at minimum) sufficiently alleged the existence of trade secrets for those same categories of information.

The two cases cited by ARS do not advance its position. The first, *EVRYTHNG Ltd. v. Avery Dennison Retail Info. Servs., LLC*, 2021 WL 11592336, at \*1 (S.D.N.Y. Aug. 2, 2021), was decided on a motion for preliminary injunction and not a motion to dismiss, which is an entirely different standard. *See Engine Cap. Mgmt., LP v. Engine No. 1 GP LLC*, 2021 WL 1372658, at \*5 (S.D.N.Y. Apr. 10, 2021) ("[A] plaintiff at the preliminary-injunction stage has a heavier burden than a plaintiff bears in pleading the plausible claim necessary to avoid dismissal.")

(internal quotation marks omitted).  The second, *Elsevier*, is equally unavailing.  There, the court found that the plaintiff failed to sufficiently allege the existence of a trade secret when it simply listed general categories such as "analytics, analytics tools, and analytics programming," and "ontology process and tools" without providing any more detail.  *Elsevier Inc., v. Dr. Evidence, LLC*, 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018).  The Complaint's allegations describing Aptar's trade secrets bear no resemblance to those in *Elsevier*.

ARS's argument that Aptar failed to "distinguish which information is 'trade secret' versus merely 'confidential'" is both factually erroneous and also premature.  Mot. at 9.  As an initial matter, the contention is premature because "whether proprietary information qualifies as a trade secret is ordinarily a question of fact not resolvable on a motion to dismiss."  *Catalyst Advisors L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 672 (S.D.N.Y. 2022).  ARS's reliance on *Benitez* is of no help as that court was deciding plaintiffs' trade secret claim at summary judgment, with the benefit of a developed factual record that is entirely absent here.  *See Benitez v. Valentino U.S.A. Inc.*, 2024 WL 1347725, at *1 (S.D.N.Y. Mar. 29, 2024).  In any event, as noted above, the fact that Aptar's Complaint sets forth, in great detail, seven specific trade secrets, separate and apart from confidential information (Compl. ¶¶ 45-82), along with the documents that contained them (*id*. ¶¶ 128-134, 151-153), renders this argument moot.

There can be no serious dispute that Aptar's Complaint goes well beyond what is required by law in alleging the existence of trade secrets and puts ARS on notice regarding the types of information ARS is alleged to have misappropriated.  The case law is replete with failed motions to dismiss attacking far more sparse descriptions than Aptar has pled here.  *See, e.g.*, *Tesla Wall Sys.*, 2017 WL 6507110, at *10 (trade secrets "need not be disclosed in detail in a complaint"); *Lavvan*, 2021 WL 3173054, at *4 (trade secrets sufficiently alleged even though plaintiff

"describe[d] its trade secrets in relatively broad terms: regulatory and business trade secrets about market opportunities and manufacturer selection").

    *ii.*    *Aptar's patents are not inconsistent with an actionable trade secret misappropriation claim.*

Ironically, despite arguing that Aptar's trade secrets are insufficiently defined (Mot. at 9-10), ARS also asks the Court to find that those same trade secrets were already disclosed in unidentified patents.  Mot. at 7-8.  ARS's arguments for dismissal on this basis are predicated on a gross misunderstanding of the law, and regardless, require the Court's resolution of factual issues that are improper on a motion to dismiss.

ARS contends that the Complaint fails to allege a trade secret because Aptar "chose to file patents on its UDSl, thereby publicly disclosing the details of the invention."  Mot. at 7.  ARS's argument incorrectly assumes that patent protection is entirely coextensive with trade secret protection.  It is not.  *See Christianson*, 870 F.2d at 1294, 1303 (7th Cir. 1989) (rejecting the argument that the trade secret holder "no longer had any proprietary interest in the parts at issue since the patents on the parts had expired" or that there was no "trade secret protection relating to the parts because the [trade secret] information . . . should have been included in . . . patent disclosures"); *see also Christianson*, 822 F.2d at 1563 (Fed. Cir. 1987).  In fact, ARS's cited authority explicitly states that "a plaintiff can still have 'a viable trade secret claim' if 'elements of the trade secret go beyond what was disclosed' in the patent application."  Mot. at 7 (citing *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 518 (S.D.N.Y. 2017)).  It is clearly not, as a matter of law, the case that the expiration of patent protection (which has not occurred here (Compl. ¶ 45)) nullifies the existence of trade secret protection, as ARS contends.

As a close cousin to the first argument, ARS contends that Aptar's trade secrets "would have had to have been disclosed in Aptar's patents to enable the public to make and use the device

without undue experimentation and therefore, are not secret." Mot. at 8. ARS appears to be taking the position that the enablement requirement of patent law is the same as the secrecy requirement for trade secrets. Again, it is not. Whether a patent is enabled under patent law, *i.e.*, whether a person of ordinary skill can make and use the invention claimed in the patent, is a wholly different inquiry from whether a trade secret is disclosed under trade secret law. *See, e.g.*, *Metso Mins. Indus., Inc. v. FLSmidth-Excel LLC*, 733 F. Supp. 2d 990, 995-96 (E.D. Wis. 2010) (declining to equate patent law's lack of "undue experimentation" requirement for enablement with trade secret requirement that the matter must not be generally known or readily ascertainable, "owing to the difference in the standards for patent law and trade secret protection"). In short, even if someone can make the invention, that does not mean they can manufacture it at scale consistent with the applicable safety and reliability requirements.

Put simply, the fact that Aptar chose to protect as trade secrets, for example, aspects of the UDSl that are required for commercialization (*i.e.*, mass production), while patenting other aspects of the device (Compl. ¶ 45) does not nullify those trade secrets. *See Christianson*, 822 F.2d at 1562 (Fed. Cir. 1987) (citations omitted) ("[N]othing in the patent law requires that a patentee must disclose data on how to mass-produce the invented product."). It certainly also does not mean that Aptar is "extending its expired patents indefinitely," as ARS hyperbolically contends. Mot. at 9. In any event, ARS's argument to that effect concerns factual issues going to the merits and should not be resolved on a motion to dismiss. *See Catalyst Advisors*, 602 F. Supp. 3d at 672; *see also Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987) ("The existence, *vel non*, of a trade secret usually is treated as a question of fact."); *Uni-Sys., LLC v. U.S. Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 176 (E.D.N.Y. 2018) ("Defendants' argument that trade secret information is visible to the public and could be reverse engineered . . . is premature in deciding

12

defendants' motions to dismiss."); *iSentium, LLC v. Bloomberg Fin. L.P.*, 2018 WL 6025864, at *4 (S.D.N.Y. Nov. 16, 2018) (whether "the claimed trade secrets could overlap with descriptions contained in [a patent]" should be "explore[d] . . . through discovery").

> 2. Aptar more than plausibly pleads that ARS misappropriated Aptar's trade secrets through a comprehensive set of factual allegations.

ARS also seeks to dismiss at the pleading stage the entirety of Aptar's DTSA claim on the basis that Aptar failed to sufficiently plead misappropriation of Aptar's trade secrets. Mot. at 11. In making this argument, ARS is asking the Court to draw the ***unreasonable*** inference that ARS identified a second manufacturer that was able to make an ***interchangeable*** product with the UDSl, notwithstanding that it had never before created such a device, and that the second manufacturer did so ***without the trade secrets in ARS's possession but for the benefit of ARS***. None of this wishful thinking is acceptable under the law.

As set forth more fully below, the Complaint alleges a series of facts and convenient coincidences that readily establish the reasonable inference that ARS misappropriated Aptar's trade secrets. The reasonable inferences include that: ARS had access to Aptar's trade secrets at issue; ARS expressed a desire to have a second supplier, and sought better commercial terms than it had with Aptar, for a product that ARS believes has the potential to be a commercial "blockbuster"; Aptar was the only supplier of a device for intranasal emergency-use FDA-approved products in the market; and ARS partnered with another company that is alleged to have never before made an emergency-use device for FDA approval, which nonetheless managed to create not just a similar device but an "interchangeable" device with Aptar's, in an extraordinarily compressed time period, and which is being marketed as identical to the Aptar device. Far from being "pure speculation," or relying on a "ladder of suppositions," as ARS complains (Mot. at 13), Aptar's mountain of well-pled allegations of misappropriation is more than sufficient at the

pleading stage.

> i.    ARS had the opportunity and motive to disclose Aptar's trade
> secrets to a second manufacturer.

ARS argues that "the Complaint contains no evidence that ARS disclosed Aptar's trade secrets to Silgan or anyone else." Mot. at 11. But Plaintiffs, at the pleading stage, are not required to allege direct evidence of the improper disclosure where the relevant evidence is uniquely within Defendants' control "or where [plaintiff's] belief is based on factual information that makes the inference of culpability plausible." *Lavvan,* 2021 WL 3173054, at *5. Here, as set forth below, the Complaint more than alleges sufficient facts to show opportunity and motive for ARS's misuse of Aptar's trade secrets.

As alleged, ARS had access to Aptar's trade secrets and ample opportunity to provide them to another supplier in the narrow window in which Silgan "developed" its interchangeable device in time for regulatory approval. ARS's access to Aptar confidential information began in 2015 and continued for years. Compl. ¶¶ 106, 114, 117, 138, 139. Beginning in 2020, when the project focused on developing an intranasal epinephrine spray using the UDSl, that information included at least seven of Aptar's trade secrets relevant to the UDSl. *Id.* ¶¶ 114, 118, 124, 139, 148. At the same time, ARS's CEO gained access to Aptar's trade secret information in the course of providing consulting services for several other customers of Aptar's UDSl. *Id.* ¶ 108. The fact of ARS's access is undisputed. *Id.* ¶¶ 124, 127-134, 148-153.

In addition to opportunity, ARS also had a powerful motive to find a second supplier and assist that supplier in competing with Aptar in order to capture purportedly better commercial terms and more of the financial upside from a product expected to generate substantial revenue. *Id.* ¶¶ 253-60. To that end, ARS has touted neffy's potential to be a "blockbuster," which makes clear ARS's belief that profits from the sale of neffy could be significant, if not transformative. *Id.*

14

Over the years, as the development of neffy was underway, ARS demanded better commercial terms from Aptar and threatened to find another supplier. *Id*. ¶¶ 7, 181. These demands were against the backdrop of ARS's acknowledgement that no competitor had come close to providing the reliable single-dose emergency-use delivery system that Aptar offered (*id.* ¶¶ 41, 181) and the reality that, until now, the UDSl was the only single-dose intranasal system commercially available on the market for emergency-use applications. *Id*. ¶ 186.

ARS's access and motive are clear. To these significant inferences, ARS has no response, other than to call them "circumstantial datapoints." Mot. at 15. But the reasonable inferences are all in Aptar's favor. *See, e.g.*, *Eastman Chem. Co. v. AlphaPet Inc.*, 2011 WL 5402767, at *7 n. 9 (D. Del. Nov. 4, 2011) (noting importance of allegations of motive and opportunity at the motion to dismiss stage); *Smart Surgical, Inc. v. Utah Cord Bank, Inc*., 2021 WL 734954, at *6 (D. Utah Feb. 25, 2021) ("misappropriation may be inferred at the pleading stage when a company has the motive and opportunity to steal trade secrets").

> ii.    *ARS's second supplier had no previous experience in manufacturing devices in this highly technical and highly regulated field.*

Neffy is a single-use product intended to be manufactured on a large-scale which **must** deliver a precise dose of a drug with 99.999% reliability when an adult or child is experiencing a potentially life-threatening allergic reaction. The stakes are extraordinarily high because if the device fails, the results could be fatal. Unsurprisingly, emergency-use combination drug products (such as neffy) are heavily regulated. The Complaint alleges, on information and belief, that Silgan had **never** produced a drug delivery device to be used in any FDA-approved emergency-use combination product. Compl. ¶¶ 13, 191. Although ARS asks this Court to take notice of Silgan's website to tout Silgan's manufacturing capabilities (Mot. at 4, n.1), it does not offer the website, or anything else, to refute this critical point—and nothing on the website does so.

In sharp contrast, Aptar has been manufacturing versions of the UDSl since the 1990s, and, after spending millions of dollars and decades researching and perfecting the device, has supplied millions of its UDSl delivery systems in eight FDA-approved combination products, including Narcan. Compl. ¶¶ 3, 13, 33, 83. Before Silgan acted, there were no competing products in the emergency-use market because of the high technological barriers to entry in this space, including the ability to mass produce a device that can meet the FDA's 99.999% reliability standard. *Id.* ¶¶ 2, 59, 134, 186, 196, 200, 205.

Silgan is alleged, on information and belief, to have developed an interchangeable device with the UDSl which can meet the 99.999% reliability guidance within a highly accelerated period of time. *Id.* ¶ 186, 191. The timeline of events leading to the approval of neffy supports the allegation. By January 2021, ARS was in possession of Aptar's trade secret information. *Id.* ¶ 122, Ex. B at Exhibit A. In August 2022, ARS filed its neffy NDA, which the FDA approved in August 2024. *Id.* ¶¶ 137, 178. During this two-year period between initial filing and approval, Aptar continued to support the regulatory approval process and gave ARS access to additional trade secret information. *Id.* ¶¶ 139, 148, 150. Because ARS's submissions to the FDA are "peculiarly within the possession" of ARS, only discovery in this litigation will reveal whether ARS disclosed Aptar's trade secrets to Silgan by the time of ARS's initial submission in August 2022, or at some point thereafter during the approval process. *Lavvan*, 2021 WL 3173054, at *5. But it is reasonable to infer that Silgan's alleged UDSl clone was developed in this tight two-to-three-year window of time, which precisely met ARS's needs, given that, during the pendency of ARS's commercial relationship with Aptar, ARS is alleged to have specifically acknowledged the lack of alternatives in the marketplace at the same time it was expressly seeking a competitor product. Compl. ¶¶ 181, 191.

ARS asserts in response only that it is ***possible*** to infer that Silgan began developing its product ***before*** 2021.  *See* Mot. at 19.  That speculation might be more plausible ***if*** Silgan had developed a competitor device that was not interchangeable with Aptar's, ***if*** Silgan had brought its device to market ***before*** neffy had been conceived, or ***if*** Silgan had any experience with any other FDA-approved emergency-use product—but none of these hypotheticals are alleged to be true. The more plausible inference from these allegations is that Silgan did not, on its own, possess the requisite experience in this specialized area to make a device for use in an FDA-approved emergency-use product on such an accelerated time frame.  *See BAE Sys. Info. & Elec. Sys. Integration Inc. v. L3Harris Cin. Elecs. Corp.*, 716 F. Supp. 3d 206, 226 (S.D.N.Y. 2024) (finding inference of misappropriation where defendant "had no prior knowledge or experience in [plaintiff's] scope of work and had not independently invested the time or resources to develop technology like [plaintiff's]," because "it would have been 'impossible for [defendant] to have developed its own technical solution'" in a short time frame); *Medtech Prods. v. Ranir, LLC*, 596 F. Supp. 2d 778, 790 (S.D.N.Y. 2008) (plaintiff stated a claim for trade secret misappropriation when defendant had no experience in plaintiff's market yet "was able to rush a [product] to the market"); *Medidata Sols., Inc. v. Veeva Sys.*, 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018) (misappropriation sufficiently pled where defendant used plaintiff's trade secrets "to introduce competing products in record time despite [defendant's] lack of experience" in the market).

> iii.  *ARS's second supplier allegedly developed an "interchangeable" device to Aptar's UDSl on the precise timing that ARS stood to benefit from the entry into the market of a second supplier.*

Aptar's UDSl and Silgan's clone are not alleged to be products which simply compete with one another or are even substantially similar.  ARS's Chief Legal Officer acknowledged that the FDA judged each device to be "interchangeable" with the other in the course of the FDA's review. Compl. ¶¶ 9, 189.  Consistent with the FDA's judgment, ARS implicitly represents that Aptar's

UDSl and Silgan's clone are identical when it discusses neffy with regulators, or markets neffy to the public.  Thus, when describing the delivery device for neffy in marketing materials, public statements and when addressing investors, ARS consistently refers to it as the "proven" and "highly reliable" device used in Narcan, and other specific plaudits, which can only refer to Aptar's UDSl.  *Id*. ¶¶ 229-235 (advertising neffy's "device" as having "eight FDA approvals," "over 55 million prescriptions" and a "99.999% delivery of effective dose"); *see also id.* ¶¶ 216-17 (ARS provided the FDA with information derived from the UDSl's testing when addressing both devices).  These are crucial admissions that ARS seeks to sweep under the rug.

In response, ARS makes the extraordinary argument that "[e]ven if the two devices are essentially 'the same'. . . that in no way implies that the new device was created using any confidential or proprietary information."  Mot. at 14.  This contention belies common sense and is inconsistent with the FDA's approval of a combination product.  Combination products are, by definition, a combination of ***one*** drug and ***one*** device—not one drug and ***multiple*** devices.  Compl. ¶ 10.  The "interchangeability" admission strongly suggests that the two devices, produced by different manufacturers, possess "interchangeable" resin composition, spray characteristics, tolerances, actuation force, molding and manufacturing controls, as well as a fault tree analysis to replicate the reliability testing needed—all the prerequisites that supported the 99.999% reliability rating.  *Id*. ¶¶ 192-228.  To infer otherwise would be unreasonable in the absence of any discovery to the contrary.

In a futile attempt to blunt the effect of its interchangeability admission, ARS turns to a nonsensical patent law analogy.  Citing *UCB, Inc. v. Teva Pharms. USA, Inc.*, 2015 WL 11199058, at *13 (N.D. Ga. Mar. 18, 2015), ARS argues that "representations to the FDA that two products are similar or equivalent cannot . . . establish that a product infringes a patent."  Mot. at 14.  But

that is simply the application of black-letter patent law, as explained in *UCB* and in the three subsequent cases that ARS cites in its motion (all also cited in *UCB*). *Id.* (citing *Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1349 n.3 (Fed Cir. 2008); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009); and *Abbott Lab'ys. v. Sandoz, Inc.*, 486 F. Supp. 2d 767, 776 (N.D. Ill. 2007)). These cases stand for the unremarkable proposition that, in determining patent infringement, the comparison of a plaintiff's *product* to an accused *product* is improper, because the proper comparison is with the plaintiff's *patent claims*, and that a finding of bioequivalency under patent law is therefore not *per se* patent infringement. But these cases have no relevance to an analysis of trade secret misappropriation, nor do they offer any context for evaluating the significance of an FDA determination that two devices are interchangeable in the context of a new combination product.[3] Contrary to ARS's argument (Mot. at 15), accepting Aptar's allegations does not mean that a competitor device to Aptar's UDSl could never be legitimately developed. It means that a competitor device cannot be the result of trade secret theft.

Moreover, ARS's reliance on *Abbott* for the proposition that "[i]f bioequivalency meant per se infringement, no alternative to a patented medicine could ever be offered to the public during the life of a patent," is misplaced and has no bearing on the claims at issue here. Mot. at 14. *Abbott* deals with a type of patent infringement case that involves an abbreviated new drug application (ANDA) for which Congress "established 'bioequivalence' as the basis for approving generic copies of drug products."[4] *Abbott*, 566 F.3d at 1285. That framework, its corresponding legal

---

[3] ARS misleadingly cites *Johns Hopkins* to support its dismissal of the significance of "[a]n FDA determination," (Mot. at 14-15), but it fails to note that the FDA determination at issue was deemed irrelevant because the law requires a comparison of an accused product to patent claims, not to a patented product. *Johns Hopkins*, 543 F.3d at 1349 n. 3. *Cerner Corp. v. Visicu, Inc.*, 2011 WL 27577, at *7 (W.D. Mo. Jan. 4, 2011), also a patent case citing *Johns Hopkins*, is equally inapt.

[4] *See Abbreviated New Drug Application (ANDA)*, FDA (Mar. 28, 2025) https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda.

analysis, and ARS's attempt to justify its misappropriation of Aptar's trade secrets by using terms like "bioequivalency" or "generic" are all irrelevant for at least two reasons. First, Aptar asserts misappropriation of trade secrets for the delivery device component of the neffy combination product, not for a drug. And second, even in cases involving ANDA drugs, courts have recognized the existence of trade secrets, including those related to the manufacturing processes of the drug itself. *See Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, 2011 WL 773034, at *1, 3 (D.N.J. Feb. 28, 2011) (denying motion to dismiss trade secret misappropriation claim related to drug's "manufacturing process, . . . formulations, . . . and related research and development"); *In re Dr. Reddy's Labs., Ltd.*, 2002 WL 31059289, at *1, 4 (S.D.N.Y. Sept. 13, 2002) (denying motion to dismiss trade secret misappropriation claim related to drug's "formula" and "processes").

By contrast, evidence of mere similarity of products in trade secret misappropriation cases has been found to be highly probative by multiple courts, particularly where the alleged similarities "had been the focus of [plaintiff's] confidential research and technology initiatives." *Medidata*, 2018 WL 6173349, at *4; *see also Allergan, Inc. v. Revance Therapeutics, Inc.*, 711 F. Supp. 3d 873, 889 (M.D. Tenn. 2024) ("use of a trade secret may be inferred from evidence that . . . the secret and the defendant's design share similar features") (internal quotation marks omitted). ARS's cited authority is not to the contrary. *See SS&C Techs. Holdings*, *Inc. v. Arcesium LLC*, 2024 WL 5186530, at *10 (S.D.N.Y. Dec. 20, 2024) (finding evidence of similarity not probative where the alleged trade secrets were not confidential, but "matters of general knowledge," but noting that "[c]ourts in this district have drawn a reasonable inference of misappropriation where a plaintiff alleged that defendant's product contained not only similar functionality, but also features that were unique and the focus of confidential research and development efforts").

> iv.    *All reasonable inferences from these allegations support a claim of misappropriation by ARS.*

As set forth above, the Complaint contains more than sufficient well-pled allegations to support a reasonable inference of misappropriation. ARS resorts to the default response that Aptar's complaint impermissibly relies on speculation. Mot. at 12-14, 15-21. As the discussion above makes clear, however, that argument deserves none of this Court's time. The vast majority of Aptar's allegations are based on known facts; those that are alleged on information and belief, including Silgan's lack of experience with FDA-approved emergency use devices, are permissible because they are "peculiarly" within ARS's control and require discovery to confirm. *Lavvan,* 2021 WL 3173054, at *5. It is true that Aptar alleged that, in light of the facts and circumstances discussed above, ARS could not have received FDA approval for the use of a device delivery system that is interchangeable with Aptar's, when Silgan had no experience with emergency-use devices requiring regulatory approvals, unless ARS unlawfully provided Aptar's trade secrets to Silgan. *See* Compl. ¶¶ 182, 191-228. But the inferences that Aptar draws are built on a mountain of well-pled allegations, each of which is grounded in Aptar's intimate knowledge of the FDA's reliability standards based on its decades of experience and expertise in emergency-use products. Courts have approved of similar inferences from similar allegations. *See, e.g.*, *Allergan*, 711 F. Supp. 3d at 891-92 (finding "enough circumstantial evidence from which one could plausibly infer that [defendant] used [plaintiff]'s trade secrets in creating and obtaining approval for its Botox biosimilar" where it is alleged that "it would be extremely difficult, 'if not impossible,' for anyone to produce a Botox biosimilar without access to" plaintiff's trade secrets, and the defendant is alleged to have had access to those trade secrets). Aptar has done precisely what the law requires— the allegations made on information and belief are "accompanied by a statement of the facts upon which the belief is founded." *Impax Media, Inc. v. Ne. Advert., Corp.*, 2018 WL 3962841, at *5 (S.D.N.Y. Aug. 17, 2018).

ARS spends nearly five pages discussing two inapt cases that do not support its position. Mot. at 15-19.  The first, *GMH Capital*, involved allegations of misappropriation, based on information and belief, that the court found did not contain a sufficient "statement of the facts upon which the belief is founded" for the inference that it would not have been possible for the defendants to have participated in winning a bid to purchase a pool of real estate assets without having stolen plaintiff's trade secrets, which were alleged to be comprised of highly generalized "financial estimates" and other business calculations.  *GMH Cap. Partners v. Fitts*, 2025 WL 950674, at *8-10 (S.D.N.Y. Mar. 28, 2025).  As set forth above, Aptar has, by contrast, pled a lengthy and detailed statement of facts which lays a legally sufficient foundation from which to infer misappropriation.

The second, *Perimeter Solutions*, involved a thinly pled set of allegations of trade secret theft against a competitor which had been developing a similar type of product for years and was already familiar with the regulatory requirements at issue—neither of which is the case for Silgan. *Perimeter Solutions, LP v. Fortress North America, LLC,* 2025 WL 553288, at *1, 7 (E.D. Cal. Feb. 19, 2025).  Also unlike this case, Perimeter's timing allegations concerning the misappropriation were threadbare and internally inconsistent.  *Id.* at *8.  Finally, the *Perimeter* court concluded that Perimeter's allegations did not tend to exclude an innocent explanation for how a defendant managed to disturb Perimeter's monopoly power over the version of the product the defendant had developed.  *See id*.  But there is no such issue in this case, as the "innocent" inference that Silgan independently produced an intranasal delivery device for emergency-use application is thoroughly debunked by the reasonable inferences to be drawn from detailed and robust allegations in the Complaint.

ARS spends an additional two pages trying to analogize the well-pleaded facts of this

Complaint with deficient cases that are easily distinguishable. Mot. at 20-21. Nearly all the authorities relied on involve insufficient allegations of the misuse of trade secrets based on the hiring of a former employee of the trade secret owner.[5] But the plaintiffs in those cases failed to allege facts that supported a reasonable inference that the defendants, or their new employees, did in fact access the plaintiffs' trade secrets. By contrast, the Complaint sets forth in detail how ARS received Aptar's trade secret information, in the form of deliverables under the parties' agreements (including the SOW) and information during the on-site audit, giving ARS the opportunity to improperly use that confidential information in a manner without Aptar's consent. Compl. ¶¶ 124, 148, 164. In addition, two of the cases contain conclusory allegations that defendants could not have won certain contract bids without misappropriating plaintiffs' trade secrets.[6] As described in Sections IV.A.2.i-iii, Aptar makes no such conclusory allegations. Finally, at least one case involves summary judgment and is therefore not applicable.[7] Here, at the pleading stage, Aptar's

---

[5] *See Core SWX, LLC v. Vitec Grp. US Holdings, Inc.*, 2022 WL 3588081, at *10 (E.D.N.Y. Jul. 14, 2022) (no facts alleged of what actions former employee took to acquire information); *Xsolla (USA), Inc. v. Aghanim Inc.*, 2024 WL 4139615, at *9 (C.D. Cal. Sept. 10, 2024) (declining to credit allegations that former employees took sensitive information without showing that "belief is based on factual information that makes the inference of culpability plausible"); *Phazr, Inc. v. Ramakrishna*, 2019 WL 5578578, at *4 (N.D. Tex. Oct. 28, 2019) (plaintiff merely speculates that ex-employees "*could* misappropriate its trade secrets"); *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 6655274, at *9 (C.D. Cal. Sept. 23, 2019) ("allegation[s] . . . describe a change in employment, but not wrongful conduct"); *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1175 (D. Colo. 2018) (employment of individuals with access to trade secrets "not enough to state a claim"); *Ad Lightning Inc. v. Clean.io, Inc*, 2020 WL 4570047, at *3 (S.D.N.Y. Aug. 7, 2020) ("No concrete link" between employees with trade secret access and defendant alleged).

[6] *See Fuentes-Fernandez & Co., PSC v. The Corvus Grp.*, 174 F. Supp. 378, 390 (D.D.C. 2016) (dismissing claim that "[defendant] could not have submitted a [contract bid] without utilizing [plaintiff's] trade secrets" as conclusory because plaintiff failed to allege "what information was used, or how it was used"); *Joester Loria Grp. v. Licensing Co.*, 2011 WL 1642736, at *2-3 (S.D.N.Y. Apr. 29, 2011) (dismissing claim where allegation that defendant "had to use" plaintiff's confidential information in winning bid was "solely" based on defendant's prior employment as subagent of plaintiff).

[7] *See Fortune Mfg. Co. v. Zurn Indus., LLC*, 2011 WL 13220133, at *4 (C.D. Cal. Nov. 14, 2011) (granting a motion for summary judgment, not a motion to dismiss).

well-pleaded factual allegations are entitled to the presumption of truth, and all reasonable inferences are to be drawn in Aptar's favor.

Instead of misappropriation, ARS is asking this Court to end this case on the possibility that it was just extraordinarily lucky. That is not permissible at this or any stage of the litigation. To that end, ARS repeatedly argues that Silgan could have made the UDSl from the information available in Aptar's patents. Mot. at 12. Among other problems, including that ARS confuses and conflates patent and trade secret law, as set forth above, this claim raises a host of highly specific, factual disputes that are inappropriate for resolution on a motion to dismiss. *See Next Commc'ns*, 2016 WL 1275659, at *7 (rejecting defendant's argument that proprietary information was publicly disclosed in patent applications because that argument "is essentially an affirmative defense" and "inappropriate on a motion to dismiss"); *True Velocity Ammunitions, LLC v. Sig Sauer, Inc*., 2024 WL 4583118, at *11 (D. Vt. Oct. 25, 2024) (denying motion to dismiss because defendant's argument whether "trade secrets are set forth in public patents and are therefore no longer secret . . . presents a factual question").

Finally, ARS even goes so far as to ask the Court to draw the unreasonable inference that it could have been ***another*** of Aptar's commercial partners that misappropriated its trade secrets and divulged them to Silgan—***even though the disclosure stood to immediately benefit ARS in connection with an ARS product with blockbuster potential then seeking regulatory approval***. Mot. at 21. This Court may not credit the unreasonable inference of an extraordinary coincidence when the reasonable inferences suggest otherwise. *Cf. OmniProphis Corp. v. Vanteon Corp.*, 2024 WL 3443900, at *3 (W.D.N.Y. July 17, 2024) ("The existence of other plausible inferences—even *more* plausible inferences—is not a basis for dismissal under Rule 12(b)(6).").

**B.    Aptar plausibly alleges a claim for trade secret misappropriation under New York Law**

As detailed in Section IV.A., because Aptar's "[C]omplaint sufficiently plead[s] a DTSA claim[, it] also states a claim for misappropriation of trade secrets under New York law." *Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*, 2024 WL 3835264, at \*3 (S.D.N.Y. Aug, 14, 2024). ARS's argument that Aptar's state law claims for misappropriation and breach are duplicative fails because Aptar's state law claims are not coextensive. Aptar's Complaint "goes beyond a mere breach of . . . contract" claim and alleges "acts in such a way that a trier of fact could infer that [ARS] willfully intended to harm [Aptar]," for example, by threatening to find another supplier (Compl. ¶¶ 7, 181) and willfully disclosing Aptar's trade secret information to an eventual second supplier (*id.* ¶¶ 276, 288). *Hedgeye Risk Mgmt., LLC v. Dale*, 2023 WL 6386845, at \*10 (S.D.N.Y. Sep. 29, 2023).

### C.    Aptar plausibly alleges claims of breach of contract under New York Law

ARS argues that Aptar has failed to allege breach of the parties' confidentiality agreements. Breach can be inferred from the evidence described herein, which is all that is required at the pleading stage. *See, e.g.*, *iSentium*, 2018 WL 6025864, at \*4 (denying motion to dismiss contract claim because plaintiff "plausibly alleges the misappropriation of trade secrets").

### D.    If the Court grants ARS's Motion to Dismiss, Aptar should be granted leave to amend

ARS requests dismissal with prejudice but does not cite any cases explaining why that would be warranted, especially when Aptar has not been given a prior opportunity to amend its Complaint. Although Aptar firmly believes that it has properly pled its claims, it respectfully requests leave to amend its Complaint to the extent the Court finds it deficient in any respect.

### V.    CONCLUSION

For the foregoing reasons, ARS's motion to dismiss should be denied.

Dated: July 28, 2025

AKIN GUMP STRAUSS HAUER & FELD LLP

By: /s/ *Katherine R. Goldstein*

Katherine R. Goldstein
Caitlin E. Olwell
AKIN GUMP STRAUSS HAUER & FELD LLP
Bank of America Building
1 Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Fax: (212) 872-1002
kgoldstein@akingump.com
colwell@akingump.com

Steven D. Maslowski (*pro hac vice*)
Ruben H. Munoz (*pro hac vice*)
Karina J. Moy (*pro hac vice*)
Nia Kyritsis (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1735 Market Street, 12th Floor
Philadelphia, PA 19103
Telephone: (215) 965-1200
Fax: (215) 965-1210
smaslowski@akingump.com
rmunoz@akingump.com
kmoy@akingump.com
nkyritsis@akingump.com

Anthony T. Pierce (*pro hac vice*)
Golda Lai
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Fax: (202) 887-4288
apierce@akingump.com
laig@akingump.com

*Attorneys for Plaintiffs AptarGroup, Inc. and Aptar France SAS*

26